GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

138.30 Acres of Land, situate, lying and being in Land Lot 327 of the 3rd Land District 389th G. M. District, Putnam County, Georgia, Defendant,

Mildred B. SANDERS, a/k/a Mrs. Karl D. Sanders, Jr., et al., Defendants-Appellants.

GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

377.61 Acres of Land, situate, lying and being in Land Lots 367, 368, 369, 377, 378, 379, 380, 381, 382 and 383 of the Third Land District, 389th G. M. District, Putnam County Georgia, Defendant,

Mrs. Nellie W. LARMAN, et al., Defendants-Appellants.

GEORGIA POWER COMPANY,
Plaintiff-Appellee,

v.

532.82 Acres of Land, situate, lying and being in the 145th G. M. District, Greene County, Georgia, Defendant,

Clifford H. DYAR, Jr., et al., Defendants-Appellants.

Nos. 77–1775, 77–1776 and 77–1777.

United States Court of Appeals, Fifth Circuit.

May 27, 1980.

George D. Lawrence, Jr., Eatonton, Ga., for defendants-appellants in all cases.

Charles H. Brown, Statesboro, Ga., for defendants-appellants in 77–1775.

Wallace Miller, Jr., W. Warren Plowden, Jr., Macon, Ga., for Georgia Power Co. in all cases.

Kenneth L. Millwood, Bruce H. Beerman, Atlanta, Ga., for defendants-appellants in 77–1776.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.[*]

RANDALL, Circuit Judge:

These condemnation cases present the issue whether compensation should be determined under federal law or under the law of the state where the condemned property is located when a licensee of the Federal Energy Regulatory Commission (the Commission)[1] exercises the power of eminent domain in federal court as authorized by Section 21 of the Federal Power Act, 16 U.S.C. § 814 (1976). If federal law is chosen, then the next issue for determination is whether the court should apply uniform national law or should apply, as federal law, the law of the state where the property is located. The panel held that federal law governed and the measure of compensation was to be determined under uniform national law. *Georgia Power Co. v. 138.30 Acres of Land,* 596 F.2d 644, 649 (5th Cir. 1979) (hereinafter referred to as *Larman,* the name of one of the landowners in the proceeding). In so doing, the panel was bound by our prior decision in *Georgia Power Co. v. 54.20 Acres of Land,* 563 F.2d 1178 (5th Cir. 1977), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979) (hereinafter referred to as *Dodson,* the name of one of the landowners in that proceeding). Because of the importance of the question at issue, we decided to have *Larman* reheard en banc (thereby vacating the panel opinion, 5th Cir. R. 17), to reconsider our holding in *Dodson. Georgia Power Co. v. 138.30 Acres of Land,* 602 F.2d 1243 (5th Cir. 1979). It is the opinion of a majority of the en banc court that *Dodson* was, in part, wrongly decided and, in that respect, should be overruled. We agree with *Dodson* that the source of law is federal but we now hold, contrary to *Dodson,* that the law of the state where the condemned property is located is to be adopted as the appropriate federal rule for determining the measure of compensation when a licensee of the Commission exercises the power of eminent domain pursuant to Section 21 of the Federal Power Act.

Parts I and II of the panel opinion in *Larman,* denominated "Right to a Jury Trial" and "Discretion to Appoint a Commission," (up to Part III, "Applicability of Federal Law," 596 F.2d at 648), are unaffected by our present decision on the choice of law issue and are, accordingly, approved and adopted by the court en banc. In Part IV of *Larman,* under the heading "Alleged Errors in the Commission's Final Report," the panel first set forth general principles rele-

---

[*] Judge Goldberg was a member of the en banc court under 28 U.S.C.A. § 46(c) and participated in the oral argument of the case en banc. Since that time he has taken senior status and therefore does not participate in this decision. Judges Godbold and Anderson were recused and took no part in the consideration or decision of these cases. Judge Charles Clark took no part in the consideration or decision of these cases.

[1] On October 1, 1977, the Federal Power Commission ceased to exist and its functions and regulatory responsibilities were transferred to the Secretary of Energy and the Federal Energy Regulatory Commission pursuant to the Department of Energy Organization Act, Pub.L. No.95–91, 91 Stat. 565 (August 4, 1977). *See* 42 U.S.C.A. §§ 7101, *et seq.* (1978) at §§ 7151(b) (transfer of functions to Secretary of Energy) and 7172(a) (transfer of functions to Federal Energy Regulatory Commission).

vant to commissions' reports, then discussed the commission's findings with respect to each of the properties involved and, finally, remanded for further fact findings and re-evaluation of the compensation awarded each of the landowners. The portion of that section outlining general principles relevant to commissions' reports, (up to the subheading "Sanders Taking," 596 F.2d at 649), is unaffected by our present decision and is, therefore, approved and adopted by the court en banc. The balance of the discussion in that section, however, insofar as it is dependent upon the commission's application of federal common law to the determination of the amount of compensa-tion, is rendered inapplicable by our holding that Georgia law supplies the appropriate federal standard and is superceded to that extent. Part III of the panel opinion, denominated "Applicability of Federal Law," is superceded in its entirety by this opinion.

In both *Dodson* and *Larman*, Georgia Power Company, a privately owned Georgia utility, instituted condemnation proceedings against Georgia landowners in federal court to acquire land for the Lake Wallace hydroelectric power generating project in Georgia. These proceedings were instituted pursuant to Section 21 of the Federal Power Act, authorizing persons or entities licensed by the Commission under Section 4(e) of the Federal Power Act, 16 U.S.C. § 797(e),[2] to exercise the right of eminent domain under specified circumstances. Section 21 provides as follows: ·

When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

The district judge appointed a three-member commission to determine the amount of compensation due the landowners. *See* Fed.R.Civ.P. 71A(h). The judge's instructions to the commission embodied federal rules for determining just compensation. The landowners' requests to substi-

---

**2.** Under 16 U.S.C. § 797(e) (1976), the Commission is authorized and empowered as follows:

To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among

the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: . . . *Provided further*, That in case the Commission shall find that any Government dam may be advantageously used by the United States for public purposes in addition to navigation, no license therefor shall be issued until two years after it shall have reported to Congress the facts and conditions relating thereto . . . .

Georgia Power was issued a license by the FPC for the Lake Wallace Project (then called the Laurens Shoals Project), on August 6, 1969. 42 F.P.C. 356 (1969).

tute for those instructions ones in accord with Georgia rules were denied. If Georgia law were applied, the amount awarded the landowners would be greater than it would be under federal law.[3] Under Georgia law, the value of any benefits accruing by virtue of the project to any part of the landowner's land which is not taken may be offset only against the recovery for damages to that remainder, if any, and not against the recovery for the value of the land actually taken. See Ga.Code Ann. § 36–504 (1970). Under federal law, the value of any benefits accruing by virtue of the project to the portion of the tract not taken may be offset against the recovery for the value of the land actually taken. *Bauman v. Ross*, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897); *United States v. Trout*, 386 F.2d 216 (5th Cir. 1967). Furthermore, under Georgia law, just compensation might include any increase in the value of the property caused by general knowledge of the project. See *Hard v. Housing Authority of Atlanta*, 219 Ga. 74, 132 S.E.2d 25 (1963). Under federal law, just compensation does not include any such increase in the value of the property. *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943).[4]

■ We think it clear that the source of the eminent domain power at issue here is federal. Since Section 21 licensees derive their authority to exercise the power of eminent domain from the Federal Power Act, which was passed in the exercise of a "'constitutional function or power,'" see *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) (quoting *Clearfield Trust Co. v.*

*United States*, 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943)), their rights, as well, should derive from a federal source. 440 U.S. at 726, 99 S.Ct. at 1457. We think that, in this context, federal interests are "sufficiently implicated to warrant the protection of federal law." *Kimbell Foods*, 440 U.S. at 727, 99 S.Ct. at 1457–1458. Since the statute does not specify the appropriate rule of decision, the task of interstitial federal lawmaking falls upon the federal judiciary in this case "'to declare the governing law in an area comprising issues substantially related to an established program of government operation.'" *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973) (quoting Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U.Pa.L.Rev. 797, 800 (1957)). Thus, the question which remains is whether the court should choose federal common law or state law as the applicable federal rule. See, e. g., *Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711; *Clearfield Trust*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838.

The answer to this question is largely dependent upon whether one begins with the position that state law should be adopted unless it is shown that legislative intent or other sufficient reasons exist to displace state law with federal common law or with the position that federal common law should be utilized unless it is shown that legislative intent or other sufficient reasons exist to warrant adoption of state law. Basic considerations of federalism, as embod-

---

**3.** In fact, in case No. 75–4448, the commission awarded no monetary compensation, a result which could not be reached under Georgia law. *Dodson*, 563 F.2d at 1180.

**4.** At the time *Dodson* was decided, under Georgia law, reasonable attorneys' fees would have been included in the award. See *White v. Georgia Power Co.*, 237 Ga. 341, 227 S.E.2d 385 (1976), *overruled, DeKalb County v. Trustees, Decatur Lodge No. 1602*, 242 Ga. 707, 251 S.E.2d 243 (1978). Since then, however, the Georgia Supreme Court has held that attorneys' fees need not be included in the measure

of just compensation under the Georgia Constitution. *DeKalb County*, 251 S.E.2d 243 (overruling *White v. Georgia Power Co.* and its progeny).

It appears that the two differences in the method of determining just compensation under Georgia and federal law discussed in the text above are the key differences. In any event, they are the only ones mentioned specifically on appeal. Any questions concerning the exact parameters of Georgia law on this issue will have to be resolved on remand.

ied in the Rules of Decision Act,[5] prompt us to begin with the premise that state law should supply the federal rule unless there is an expression of legislative intent to the contrary, or, failing that, a showing that state law conflicts significantly with any federal interests or policies present in this case. *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966).

Our reading of Supreme Court decisions convinces us of the correctness of our approach.[6] In *Clearfield Trust*, federal law was chosen as the applicable federal rule to govern an action against the United States on a federal check. 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838. The Court stated:

> In our choice of the applicable federal rule we have occasionally selected state law. . . . But reasons which may make state law at times the appropriate federal rule are singularly inappropriate here. The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain.

*Id.* at 367, 63 S.Ct. at 575 (citation omitted).

The choice of state law as the federal rule was thought to be similarly inappropriate in determining whether the United States could recover for damages suffered when a serviceman is injured by a third party tortfeasor. *United States v. Standard Oil Co.*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947). Uniform national treatment, rather

---

**5.** The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.
28 U.S.C. § 1652 (1976).

**6.** Ample support for this presumption favoring adoption of state law as the federal rule is found in the law review commentaries. As Professor Wechsler has said regarding the role of federalism, "National action has always been regarded as exceptional in our polity, an intrusion to be justified by some necessity, the special rather than the ordinary case. . . . The political logic of federalism thus supports placing the burden of persuasion on those urging national action." Wechsler, *The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government*, 54 Colum.L.Rev. 543, 544–45 (1954). *See also* Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U.Pa.L.Rev. 797, 814 n.64 (1957) ("Our federalism, which the [Rules of Decision] act expresses, seems to posit generally that in case of doubt, the courts should use state law, leaving new extensions of federal power to the legislative body."); Comment, *Federal Courts—Choice of Controlling Law in Cases Involving Federally Insured Mortgages*, 49 N.C.L.Rev. 358, 365 (1971) ("If the philosophy of the Rules of Decision Act is applied in answering the second question of whether to adopt the local law as the federal rule, a presumption will arise that the state law is adopt-

ed. This presumption could be rebutted by a showing of sufficient federal interest for rejection of the local law as the federal rule."); Comment, *Rules of Decision in Nondiversity Suits*, 69 Yale L.J. 1428, 1446 (1960) ("In the absence of evidence of congressional intent to the contrary, state law would seem applicable under the Rules of Decision Act in all three cases [where a federal statute is involved and 1) a term of the act requires further definition; 2) no provision is made for certain matters; or 3) the statute regulates certain areas without indicating whether existing state law in that area is preempted or continues in force where the federal law does not specifically govern], for the statute does not 'otherwise require or provide.' Of course, courts examining the major purposes of the act may find that the application of state law will cause results contrary to the objectives sought by Congress. In some cases, the lack of uniformity itself may obstruct the operation of a statute even though none of the various results are by themselves objectionable. But this is, in effect, simply a finding of congressional intent not to be bound by state law. Without that finding, state law should be followed."). *Cf.* Comment, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 823, 826 (1976) ("when the source of law is federal, Congress or the Constitution ' "require[s]" ' otherwise than that state law [should] govern of its own force") (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592–93, 93 S.Ct. 2389, 2396–97, 37 L.Ed.2d 187 (1973)).

than diversified local disposition, was called for because of the distinctively federal nature of the government-soldier relation and because the question was primarily one of federal fiscal policy, of no particular concern to the states or their citizens. *Id.* at 310–11, 67 S.Ct. at 1609–10.[7]

In *Bank of America National Trust & Savings Ass'n v. Parnell*, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956), the Supreme Court held state law applicable, refusing to extend the *Clearfield Trust* rationale to litigation between private parties even though the suit involved federal commercial paper. The Court reasoned as follows:

> The present litigation is purely between private parties and does not touch the rights and duties of the United States. The only possible interest of the United States in a situation like the one here, exclusively involving the transfer of Government paper between private persons, is that the floating of securities of the United States might somehow or other be adversely affected by the local rule of a particular State regarding the liability of a converter. This is far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern.

352 U.S. at 33–34, 77 S.Ct. at 121.

In *Wallis v. Pan American Petroleum Corp.*, the Court held that state law governed the dealings of private parties in an oil and gas lease issued under the Mineral Leasing Act of 1920. 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369. The Court there enunciated the following test:

> In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.

*Id.* at 68, 86 S.Ct. at 1304.[8]

In *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), the Court held state law applicable in an action against the county by survivors of deceased airline passengers who attempted to recover as third party beneficiaries of a contract between the county and the Federal Aviation Administration. The *Clearfield Trust* approach was inapplicable because the rights of private litigants alone were at issue. 433 U.S. at 30, 97 S.Ct. at 2494. Although the United States has a substantial interest in regulation of air travel and promotion of air travel safety, *id.* at 31, 97 S.Ct. at 2494, as was the case in *Parnell* and *Wallis*, any federal interest in the outcome of the specific question before the Court was " 'far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern.' " *Id.* at 32–33, 97 S.Ct. at 2495–2496 (quoting *Parnell*, 352 U.S. at 33–34, 77 S.Ct. at 121–122).

Finally, in *Kimbell Foods*, decided after *Dodson*, the Court held that state law should be adopted as the appropriate federal rule for establishing priorities of competing federal (SBA and FHA) and private liens since a national rule was unnecessary to protect the federal interests involved. 440 U.S. 718, 99 S.Ct. at 1453. The Court rejected what it considered "generalized pleas for uniformity as substitutes for concrete evidence that adopting state law would adversely affect administration of the federal programs." *Id.* at 730, 99 S.Ct. at 1459. The government's argument that the special priority accorded federal tax liens was required here as well, since application of state law would undermine its ability to recover funds disbursed under the lending programs and thus would conflict with program objectives, was also rejected. *Id.* at 733–38, 99 S.Ct. at 1461–1464. The special priority the government commands in its tax collecting capacity was not warranted in this context where it was in sub-

---

7. Judge Wisdom viewed these early cases, *Clearfield Trust* and *Standard Oil*, as representative of a presumption favoring federal law, from which later cases departed. *Dodson*, 563 F.2d at 1188.

8. Judge Simpson viewed this language as "nearly, if not quite," establishing a "presumption favoring state law in choice of law cases." *Dodson*, 563 F.2d at 1194 (dissent).

stantially the same position as private lenders. *Id.*

The foregoing review of Supreme Court decisions leads us to the conclusion that they do indeed evidence "a growing desire to minimize displacement of state law," *Dodson*, 563 F.2d at 1189, and that conclusion strongly supports our position that state law should be adopted as the federal rule of compensation unless it is shown that legislative intent or other sufficient reasons exist to displace state law with federal common law.

■ Our review of the relevant legislative history reveals no express congressional intent that federal common law and not state law should supply the federal rule in determining the measure of compensation in condemnation cases brought under Section 21. Therefore, we turn to an examination of the considerations relevant to the "nature of the specific governmental interests and to the effects upon them of applying state law." *Standard Oil*, 332 U.S. at 310, 67 S.Ct. at 1609. If the effect of applying state law is virtually to nullify the federal objectives, then there is a conflict that precludes application of state law. *See, e. g., Little Lake*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187. If application of state law would arguably interfere with an identifiable federal policy or interest, but not amount to a conflict which would preclude application of state law, we must proceed to an examination of the relative strength of the state's interests in having its rules applied. *See United States v. Yazell*, 382 U.S. 341, 351–53, 86 S.Ct. 500, 506–07, 15 L.Ed.2d 404 (1966); *cf. Little Lake*, 412 U.S. at 599, 93 S.Ct. at 2400 (although adoption of state law was precluded because it conflicted with the federal program regarding federal land acquisitions under the Migratory Bird Act, the Court stated that its conclusion might conceivably be influenced if the retroactive state statute sought to be applied served "legitimate and important state interests the fulfillment of which Congress might have contemplated through application of state law"); *Wallis*, 384 U.S. at 68, 86 S.Ct. at

1304 (not reaching the issue since no significant threat was found). *See generally* Comment, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 799 (1976).

■ While we do not deny the existence of important federal interests in issues arising under the Federal Power Act (indeed, that is the basis for our decision that federal law governs in the first place), we are of the opinion that the interests of the United States in the determination of the amount of compensation a private licensee must pay a landowner in a condemnation proceeding under Section 21 are not sufficient to warrant displacement of state law on that issue. Before a license may be issued under the Federal Power Act, there must be a determination by the Commission that the project does not affect the "development of any water resources for public purposes [that] should be undertaken by the United States itself." 16 U.S.C. § 800(b). Thus, by definition, a licensed project does not implicate the interests of the United States to the degree that it is thought desirable that the project be undertaken by the United States itself. We find persuasive and relevant to determining the nature of federal and state interests in this case the distinction observed by the Ninth Circuit in *Public Utility District No. 1 v. City of Seattle*, 382 F.2d 666, 669–70 (9th Cir.), *cert. dismissed*, 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59 (1969) (even though it was made in support of its finding, which we deem erroneous, that Section 21 does not delegate full eminent domain power):

We first observe that the position of a licensee is distinguishable from that of the United States with respect to furthering of the national interest. By issuance of a license the United States is not acting in the national interest through the licensee to the same extent as it would if it undertook the project itself. The United States acts in the public interest on a national scale; the licensee often on a local scale, on projects thought to be of insufficient dimensions to warrant the assertion of national power. In many cases

the requirements of federal permission and regulation are all that the national interest requires. Frequently the licensee is a privately owned utility or even manufacturer, seeking the license for purposes of profit.

Although federal rules have been applied to the determination of just compensation in federal condemnation cases where the United States is the party condemning and paying for the land,[9] we do not deem those decisions controlling[10] since our case arises in the context of a Section 21 proceeding by a licensee where the nature of the federal interests involved differs markedly from the nature of the federal interests involved

9. *See, e. g., United States v. Miller*, 317 U.S. 369, 380, 63 S.Ct. 276, 283, 87 L.Ed. 336 (1943); *United States v. Certain Property Located in Borough of Manhattan*, 344 F.2d 142, 146 (2d Cir. 1965); *United States v. City of New York*, 165 F.2d 526, 528 (2d Cir. 1948) (L. Hand, J.); *United States v. Certain Parcels of Land*, 144 F.2d 626, 628 (3d Cir. 1944); *United States v. 3,595.98 Acres of Land*, 212 F.Supp. 617 (N.D. Cal.1962).

10. The majority in *Dodson* denied being bound by those cases but was of the opinion that those decisions were helpful starting points even though they did not involve federal condemnations by Section 21 licensees. Judge Wisdom wrote:

> Other courts in federal compensation cases have balanced the state and federal interests and have concluded that federal, rather than state, law should supply the rules of compensation. Unless we find the weights on our scale to be substantively different, we see no reason to diverge from the conclusion of the Supreme Court and some of our Courts of Appeals.

*Dodson*, 563 F.2d at 1186, n. 21. While a decision to apply federal rules of compensation might implicitly involve a determination that federal interests outweigh state interests, we do not find the cases cited persuasive since they contain no express interest analysis, which may be indicative of the importance attached to the presence of the United States as the condemnor in those cases.

In support of its contention that there is no need to balance any interests in this case, Georgia Power Company places great reliance on *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977), where the court refused to apply the law of the state (which, unlike federal law, awards costs and expenses, including attorneys' fees, to landowners who obtain judgments in inverse condemnation actions against public entities) in a successful inverse condemnation action brought under the fifth amendment against a federally assisted city redevelopment agency. The Ninth Circuit viewed the Supreme Court's reasoning in a Miller Act case, *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), controlling. The Miller Act provides a remedy for suppliers and subcontractors who perform services or provide material for a contractor in connection with construction on federal property who must bring suit to recover money owed them by the contractor. 40 U.S.C. § 270a *et seq.* (1976). In *F. D. Rich Co.*, the Supreme Court stressed the importance of a uniform national rule and reversed the Ninth Circuit's holding that the Miller Act requires an award of attorneys' fees where the "public policy" of the state in which suit is brought allows an award of fees in similar contexts. One reason for reversal was expressed as follows:

> Although the court below premised its decision on the theory that a Miller Act remedy is afforded " 'in lieu of the lien upon land and buildings customary where property is owned by private persons,' " it gave respondent more protection than California law affords litigants involved in disputes arising from private construction projects who are not entitled to an award of attorneys' fees. We think it better to extricate the federal courts from the morass of trying to divine a "state policy" as to the award of attorneys' fees in suits on construction bonds.

417 U.S. at 128, 94 S.Ct. at 2164. The Court also pointed out that "[m]any federal contracts involve construction in more than one State, and often, as here, the parties to Miller Act litigation have little or no contact, other than the contract itself, with the State in which the federal project is located." *Id.* at 127, 94 S.Ct. at 2164. In view of the foregoing analysis, discussing federal and state interests, we do not think *Richmond Elks Hall* lends much support to Georgia Power's theory that there is no need to balance interests and we do not deem controlling on the issue before us the following language from *F. D. Rich Co.* quoted by the court in *Richmond Elks Hall*:

> The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law. Neither respondent nor the court below offers any evidence of congressional intent to incorporate state law to govern such an important element of Miller Act litigation as liability for attorneys' fees. [*F. D. Rich Co.*, 417 U.S.] at 127, 94 S.Ct. at 2164.

561 F.2d at 1334. Furthermore, we note that unlike Section 21 licensees, the redevelopment agency in *Richmond Elks Hall* was federally funded.

where the United States is the condemnor. Furthermore, while also not controlling, there is authority for the application of state law to questions concerning compensation, such as admissibility of evidence of consequential damages and the propriety of interest on a compensation award in condemnation actions brought in federal court under Section 21. *See, e. g., Feltz v. Central Nebraska Public Power & Irrigation Dist.*, 124 F.2d 578 (8th Cir. 1942).[11]

The overriding federal interest at stake in a case such as this one is in implementing or effectuating the federal program. Thus, if state law is so hostile that its application would actually frustrate this objective, a conflict exists which precludes adoption of state law as the federal rule. *See Little Lake*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187. The specific federal interests or policies which may be identified under the Federal Power Act are 1) maximization of hydroelectric development, 2) reduced energy costs and 3) minimization of cost to the government should it decide to exercise its option to acquire a project at the expiration of the license term, upon payment of "net investment," not exceeding the "fair value" of the property taken, under Section 14(a) of the Federal Power Act, 16 U.S.C. § 807(a) (1976).[12] *See First Iowa Hydro-Electric Cooperative v. FPC*, 328 U.S. 152,

**11.** *See also Central Nebraska Pub. Power & Irrigation Dist. v. Harrison*, 127 F.2d 588 (8th Cir. 1942); *Central Nebraska Pub. Power & Irrigation Dist. v. Fairchild*, 126 F.2d 302 (8th Cir. 1942); *Samuelson v. Central Nebraska Pub. Power & Irrigation Dist.*, 125 F.2d 838 (8th Cir. 1942); *Burnett v. Central Nebraska Pub. Power & Irrigation Dist.*, 125 F.2d 836 (8th Cir. 1942); *McGinley v. Central Nebraska Pub. Power & Irrigation Dist.*, 124 F.2d 692 (8th Cir. 1942); *Central Nebraska Pub. Power & Irrigation Dist. v. Berry*, 124 F.2d 586 (8th Cir. 1942).

**12.** Section 14(a) of the Federal Power Act provides as follows:

Upon not less than two years' notice in writing from the Commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project or projects as defined in section 796 of this title, and covered in whole or in part by the license, or the right to take over upon mutual agreement with the licensee all property owned and held by the licensee then valuable and serviceable in the development, transmission, or distribution of power and which is then dependent for its usefulness upon the continuance of the license, together with any lock or locks or other aids to navigation constructed at the expense of the licensee, upon the condition that before taking possession it shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and dependent as above set forth but not taken, as may be caused by the severance therefrom of property taken, and shall assume all contracts entered into by the licensee with the approval of the Commission. The net investment of the licensee in the project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the Commission under this chapter, by the license or by good will, going value, or prospective revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: *Provided*, That the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this chapter at any time by condemnation proceedings upon payment of just compensation is expressly reserved.

16 U.S.C. § 807(a)(1976). The option provision has been cited as illustrative of the "closeness of the relationship of the Federal Government to these projects and its obvious concern in maintaining control over their engineering, economic and financial soundness." *First Iowa Hydro-Electric Coop. v. FPC*, 328 U.S. 152, 172–73, 66 S.Ct. at 906, 90 L.Ed. 1143 (1946). *See also id.* at 181 n. 25, 66 S.Ct. at 920, n. 25. The government, however, in its amicus brief to the Supreme Court on petition for certiorari in *Dodson*, brief for United States at 12, *Boswell v. Georgia Power Company*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979), described the governmental interest arising from this option as a "less important federal interest" since it cannot be predicted with confidence that many licensed projects will be recommended for federal take-over as their terms expire. Since under Section 7(b) of the Act, 16 U.S.C. § 800(b), approval may not be given for any application for a project when the Commission finds that "the development of any water resources for public purposes should be undertaken by the United States itself," the landowners argue that exercise of the option is unlikely because it will have already been determined that it was unnecessary for the United States to undertake the project initially.

171–74, 180, 66 S.Ct. 906, 915–16, 919, 90 L.Ed. 1143 (1946). *See generally* J. Kerwin, *Federal Water-Power Legislation* (1926).

It is clear to us that application of state law to the narrow question of the determination of the amount of compensation a licensee must pay a landowner does not nullify federal objectives and does not result in a conflict which would preclude application of state law. In *Little Lake*, application of a state statute retroactively making mineral rights imprescriptible would have deprived the federal government of its previously bargained for contractual interests in mineral rights and would have created uncertainty in the land acquisition program embodied in the Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.* The Court held that "borrowing" state law in this case would be inappropriate since "specific aberrant or hostile state rules do not provide appropriate standards for federal law." *Little Lake*, 412 U.S. at 595–96, 93 S.Ct. at 2398. Georgia Power Company argues that it would likewise be inappropriate to apply Georgia law to the computation of just compensation in condemnation actions in federal court under Section 21 since, especially in its allowance of enhanced value resulting from knowledge of the project, as to which it is admittedly in the minority,[13] the Georgia law is sufficiently aberrant and hostile to the energy program embodied in the Federal Power Act. We do not agree that application of a state law which results in higher awards to the landowners, even when aspects of that law represent the minority position, amounts to the kind of conflict which precluded adoption of state law in

*Little Lake.* Compare *Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404, where the Court held that state law governed in a suit by the United States to collect a debt owed the SBA even though application of that particular state law precluded the government's recovery. The Court recognized that the state's law of coverture, successfully invoked by the debtor, was "peculiar and obsolete" and had even been repealed in Texas subsequent to the events in the case. 382 U.S. at 351, 86 S.Ct. at 506. Nevertheless, the Court declined to override the state law because

> state interests, particularly in the field of family and family-property arrangements . . . should be overridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied.

*Id.* at 352, 86 S.Ct. at 507.

Although application of state law resulting in higher condemnation costs to the licensee is not precluded, nevertheless, since application of the state law arguably burdens or interferes with the three federal interests or policies enumerated above, we must weigh the federal interest in avoiding this interference against the state interest in having its law applied.

In any case involving the issue of choice of federal or state law, the desirability of uniformity achieved by application of federal common law may be advanced. Where, however, as here, uniformity bears little relation to the federal program at issue,[14] it does not weigh heavily in favor of applica-

---

**13.** The Supreme Court of Georgia answered contentions that only Georgia has a rule allowing enhancement in value resulting from the improvement as follows:

> To such contentions we would reply further by paraphrasing a statement of a great president who once said, "Everybody is against me—everybody except the people," by saying that all the decisions are against what we hold—all except the controlling decisions of the courts of Georgia. On this point in *Green v. Coast Line Railroad Co.*, 97 Ga. 15, at pages 36 and 37, 24 S.E. 814, at page 822, 33 L.R.A. 806, this court said: "Every direct

authority known to us is against us. Nevertheless, we are right, and these authorities are all wrong, as time and further judicial study of the subject will manifest."

*Hard v. Housing Authority of Atlanta*, 219 Ga. 74, 132 S.E.2d 25, 30 (1963).

**14.** We take the opportunity to note at this juncture that the Federal Power Act does not represent an attempt by Congress to provide for application of uniform national law to all aspects of hydroelectric development under the Act. Examining the legislative history which primarily indicates congressional desire to in-

tion of uniform federal law. Furthermore, since a licensee often has the option of utilizing either state or federal eminent domain power (as Georgia Power Company has with respect to most, if not all, of the land taken for the Lake Wallace Project), application of uniform federal law when a licensee proceeds under the federal power authorized by Section 21 could result in a corresponding loss of uniformity even in a single project.[15] Of course, distinguishing cases where the United States is the condemning party from cases where a licensee is the condemnor, applying federal law to determine the measure of compensation in the former but not in the latter, might be thought to be equally lacking in uniformity and undesirable.[16] Since national uniform-

sure the passage and constitutionality of the Act in order to promote the long needed development of water power, the Supreme Court cited as illustrative of the integration of state and federal jurisdiction, which carefully preserves the separate interests of the states, the following provisions:

[Section] 4(a) and (c), cooperation of the Commission with the executive departments and other agencies of the State and National Governments is required in the investigation of such subjects as the utilization of water resources, water-power industry, location, capacity, development costs and the relation to markets of power sites, and the fair value of power. § 4(f), notice of application for a preliminary permit is to go to any State or municipality likely to be interested. § 7(a), in issuing permits and licenses preference is to be given to States and municipalities. § 10(e), licenses to States and municipalities under certain circumstances shall be issued and enjoyed without charge. § 14, a right is reserved not only to the United States but to any State or municipality to take over any licensed project at any time by condemnation and payment of just compensation. §§ 19 and 20, regulation of service and rates is preserved to the states.

*First Iowa Hydro-Electric Coop.*, 328 U.S. at 174–75 n. 19, 66 S.Ct. at 916, 917 n. 19. This integration refutes any argument that failure to promote ease in federal administration through adoption of uniform national standards of compensation significantly undermines operation of the energy program. We think that Sections 19 and 20, 16 U.S.C. §§ 812 and 813, expressly limiting the Commission's authority to regulate rates and other charges, which are directly related to energy costs, to situations where a state does not have its own regulations, is telling of the absence of intent to apply uniform federal law to the compensation question.

Although cost of land acquisition is included in rate-base determinations by the Commission in regulating interstate wholesale rates for electric power and by state utility commissions setting rates for the intrastate sale of power, the government conceded in its amicus brief to the Supreme Court on petition for certiorari in *Dodson*, brief for United States at 12 n. 11, *Boswell v. Georgia Power Company*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979), that

"the Commission has not, either in its rules and decisions determining what costs for hydroelectric projects are allowable under 16 U.S.C. 797(b) [determination of "actual legitimate original cost of and the net investment in a licensed project"] or in its rules and decisions governing rate-making by interstate wholesalers of electricity and natural gas, developed a standard favoring the use of either federal or state criteria in the valuation for land acquisition purposes." *See also Grand River Dam Auth. v. Grand Hydro*, 335 U.S. 359, 374–75, 69 S.Ct. 114, 121–122, 93 L.Ed. 64 (1948) (discussing materiality of fact that valuations are used in determination of rates and net investment; holding that Federal Power Act does not displace state rules of compensation where a licensee relies only on the powers of eminent domain granted by the state; leaving open the questions of the proper measure of value in a condemnation proceeding instituted by the United States [since settled in favor of application of federal law, *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956)] or by one of its licensees under Section 21).

**15.** We express no opinion as to whether Congress had the power to compel "application of a uniform, *federal* standard in *any* exercise of eminent domain power, state or federal, to acquire land on which to build these federally regulated facilities" as contended by Judge Simpson, *Dodson*, 563 F.2d at 1200 (dissent) and disputed by the majority, *id.* at 1183 n. 16.

We agree with the majority in *Dodson* that the landowners' arguments that impermissible forum shopping and denial of equal protection may result from application of different standards of compensation when a licensee has the option of proceeding under state or federal powers of eminent domain are without merit. *Id.* at 1191–93.

**16.** Indeed, the same lack of uniformity in a single project could result if state law is applied to determine compensation when a licensee condemns the property and if federal law is applied to determine the "fair value" to which "net investment" is limited when the United States exercises its take-over option under Section 14. We note that, as pointed out by Judge

ity is not specifically related to the operation of the Federal Power Act and since application of either federal or state law may result in a corresponding loss of uniformity, arguably cancelling out the advantage otherwise gained, we do not count this argument in either side's favor.[17]

In analyzing the state's interests in having its laws of compensation apply when a licensee exercises the power of eminent domain under Section 21 of the Federal Power Act, we begin with the state's interest in avoiding displacement of its laws in the area of property rights, traditionally an area of local concern. Since property has been viewed as a bundle of valuable rights and since the question of what constitutes property is usually determined with reference to state law,[18] we think it consistent that the value of those rights also be determined with reference to state law. Since states, as well as the federal government, have an interest in providing economical energy to their citizens, their laws of compensation, accommodating that interest with that of insuring that their condemnee-landowner citizens are compensated in ac-

cord with their (states') views of what is just, are entitled to weight. As pointed out by the landowners, a Section 21 licensee-condemnor is typically either the state itself, a state-owned entity, a municipality or a private utility, organized and operating under the laws of the state and heavily regulated by a state utility commission. A licensee usually condemns property for a project and sells electricity produced therefrom only in the state where it operates. This case, for example, involves a private corporation using private funds to take private property from a private landowner.

Georgia Power Company asserts that the application of Georgia law as the federal rule of compensation in these cases will result in higher land acquisition costs than those which would have obtained if the law applicable to cases in which the federal government is the condemnor were applied.[19] Georgia Power goes on to assert that because those costs will ultimately be recovered from consumers of hydroelectric power in the form of higher charges for power, the selection of Georgia law will

Simpson, problems of interpretation of "net investment" emphasize that "whether the price paid by a state party in a Section 21 condemnation will affect the price later paid by the federal government in exercising its option under Section 14 is by no means certain." *Dodson*, 563 F.2d at 1198 n. 11. *See also Grand River Dam Auth. v. Grand Hydro*, 335 U.S. at 374–75, 69 S.Ct. at 121–22.

**17.** Another argument traditionally advanced in cases involving the issue of choice of state or federal law is that greater certainty may be achieved by application of well established state law on an issue as to which there is no established body of federal common law. As pointed out by the majority in *Dodson*, that argument carries no weight in this case since there is an established body of federal law on the issue of just compensation. *Dodson*, 563 F.2d at 1189–90. While that fact does not further the argument that state law should be adopted in this case, we do not view it as significantly detracting from it.

**18.** *See, e. g., United States v. Certain Property Located in Borough of Manhattan*, 344 F.2d 142, 144–45 (2d Cir. 1965) (Friendly, J.); *United States v. 145.30 Acres of Land*, 385 F.Supp. 699 (W.D.La.1974), aff'd, 524 F.2d 1231 (5th Cir. 1975).

**19.** We do not view as highly probative the conflicting assertions of the parties in their supplemental briefs on rehearing en banc concerning the inferences which should be made regarding the effects on the energy program of increased costs of condemnation based largely on certain statistics gleaned from the report of the United States Department of Energy, Energy Information Administration, Hydroelectric Plant Construction Cost and Annual Production Expenses 1976, Twentieth Annual Supplement (May 1978). The landowners argue basically that since a substantial number of projects were developed through the use of state laws of condemnation, we may conclude that use of state law does not retard hydroelectric development. While this appears to us to be largely conjectural, the argument that use of state law does retard hydroelectric development does not appear significantly less so.

The landowners also assert in their en banc briefs that the Wallace Dam Project was budgeted in anticipation that state law would control the setting of just compensation. The Power Company vigorously denies that this was the case. We decline to give weight to this disputed assertion. *Cf. Kimbell Foods*, 440 U.S. at 729–32, 99 S.Ct. at 1459–61; *Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404.

impermissibly burden the achievement of one of the principal objectives of the Federal Power Act, inexpensive hydroelectric power. Assuming that the effect of the application of Georgia law will be higher cost to the consumer, nevertheless, we disagree with the conclusion that the result is an impermissible burden on the achievement of the objectives of the Federal Power Act. To apply federal law because of the decreased cost to the consumer as compared to the cost to the consumer which would result if Georgia law were applied is to require certain Georgia landowners partially to subsidize a private Georgia utility and consumers of electric power in a way which would not be required of them if Georgia law were applied. In the absence of an indication of specific legislative intent to impose such a burden on Georgia landowners, we will not presume that Congress would have balanced the interests of private licensees and consumers of hydroelectric power, on the one hand, and the property owners, on the other hand, in a fashion different from the way in which the laws of Georgia balance such interests.

As is demonstrated by the persuasiveness of the well-reasoned positions advanced by both the majority and the dissent in *Dodson*, the choice of law question in this case is a close one. A majority of this court, however, is of the opinion that absent a showing of legislative intent to the contrary, considerations of federalism warrant a preference for adoption of state law as the federal rule. We do not find the showing of federal interests and the effects thereon of applying state law sufficient to overcome that preference in this case. Thus, we are led to the conclusion that the law of the state where the condemned property is located is to be adopted as the appropriate federal rule for determining the measure of compensation when a licensee exercises the power of eminent domain pursuant to Section 21 of the Federal Power Act.

The judgments of the district court are VACATED and the cases are REMANDED for further proceedings consistent with this opinion.

VACATED and REMANDED.

FAY, Circuit Judge, concurring:

In this era of ever-groping federal tentacles, perhaps it is quixotic to brandish one small sword in a crusade against further invasion of the powers of states. With the hope that this battle cry will not be a last gasp, I will charge forward with the apparently anachronistic views that states are sovereigns, that states do control property and property rights. A significant conflict between federal and state interests must exist to preempt state control. Trimmed to the bone, the facts of this case are that a private, Georgia utility company desires privately-owned Georgia land from Georgia citizens for a private hydroelectric power and recreation project in Georgia to supply power to Georgia citizens and to provide profit to private investors. In looking to define "just compensation" when such a private, state-controlled utility company exerts the eminent domain power to acquire private land, federal law should not control the inquiry. I therefore concur in the majority result, although I would have reached that holding by a different route.

Despite the danger of appearing to have surrendered this battle, I will also suggest an additional basis for preferring state laws as federal rules of decision.

A. *States Control Property*

A helpful, if overly-simplified, starting point may be to sketch out several types of state-federal relationships. In some instances, the Constitution forbids states to act, or grants the federal government exclusive power to act. In these subject areas, state action is precluded. At the opposite end of the spectrum are the powers the Constitution reserves to the states.[1] In

---

1. It is probably the height of naivety to recall that some of us were taught that the federal government received its powers through delegation and that powers and authority not spe-

cifically prohibited to the states nor delegated to the United States were retained by those same sovereign states. U.S.Const. amend. X.

those areas, congressional authority to regulate states is limited. *See, e. g., National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Between these poles are areas that Congress has the power to regulate, and Congress either does or does not act. If Congress has not acted, state law is usually effective. If Congress has acted, and state law conflicts, the supremacy clause requires preemption of the state law, although Congress can designate state law to be applicable. At times Congress partially exercises its powers, leaving open some questions of applicable law. In those instances, the courts decide whether federal or state law applies, under the rubric of determining the choice of law or the rule of decision.

Essentially four situations exist, therefore, in which state law may apply: when Congress expressly adopts state law, when Congress has not exercised its powers, when Congress has acted leaving some areas open, and when the tenth amendment[2] requires state law to apply of its own force. In cases involving the latter three situations, the courts must determine whether state law applies, of its own force or otherwise, and, except in some tenth amendment situations, whether it conflicts with federal programs or policies. The determination requires an inquiry into the traditional, constitutional allocation of power over subject matters between state and federal governments.

My objection to the current framework for determining choice of law is that it stands on its head the proper order of questions, losing sight of the inquiry into constitutional allocations of power. The path to choice between a federal or state rule has acquired many steps. First, the court decides whether the source of the right is state or federal. If the source is federal, the court inquires whether Congress has provided that either federal or state law

should govern. In the absence of congressional statement, the court considers whether the federal rule should be to adopt state law, or to apply or fashion a uniform federal rule. In answering this question, the court initially determines whether use of state law will truly conflict with effectuation of federal policies or programs. If the answer is "no," the court balances federal interests in uniformity against the state's interests in spheres traditionally left to local control.

In my view the initial inquiry should be into what the competing subject areas are. The first step should be a determination of whether the subject area is one traditionally left to state control, not whether the source of right is state or federal. Especially when dealing with those powers left to the states, the courts should tread gingerly to the conclusion that Congress has preempted the field. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–80, 97 S.Ct. 1292, 1302–05, 51 L.Ed.2d 480 (1977); *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). Indeed, a premise to the interstitial choice of law rulemaking is that Congress has not spoken, and therefore it should be rare to uncover an intent to preempt state law. Perhaps this explains why state law is adopted as the federal rule in so many choice of law cases.

Instead of focusing on the allocation of state-federal control over the subject areas, the current choice of law analysis requires looking to the source of the right in question. Very little space is spent discussing this threshold inquiry. If the source of right is determined to be federal, the requirements of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and the Rules of Decision Act[3] do not apply to cause state law to operate of

---

**2.** Reference to the tenth amendment is not meant to be exclusive but rather primary. *See also* U.S.Const. amend. XXI.

**3.** *See* note 7 *infra*.

its own force. The source of right is held to be federal whenever the case involves the Constitution, *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574, 75, 87 L.Ed. 838 (1943); *see Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); a federal statute, *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); a federal relationship, *United States v. Standard Oil Co.*, 332 U.S. 301, 305–06, 67 S.Ct. 1604, 1606–07, 91 L.Ed. 2067 (1947); a federal program, *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973); an implied federal cause of action, *Burks v. Lasker*, 441 U.S. 471, 476–77, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979); a federal agency, *United States v. Security Trust & Savings Bank*, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950); or a federal contract, *United States v. Allegheny*, 332 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

In a world in which the ever-burgeoning federal government colors most aspects of life, this federal nexus is rarely lacking, and, accordingly, state law rarely applies of its own force.[4] Indeed, these choice of law cases normally arise in federal court, and, absent diversity, presumably need some federal connection to enter the federal halls of justice. Therefore the question posed in the first step of the prevailing choice of law analysis is often answered the instant the action is commenced.

Perhaps it is splitting hairs to argue over the means for selecting state law as the rule of decision so long as that result is reached in the majority of cases. I, for one, however, find an inherent harm in this usurpation of state power contrary to the precepts of federalism, even if the displacement is in name only. But the characterization of the source of the question as federal goes beyond the appellation. First,

the courts still may reject state law that conflicts with or is hostile to federal policies, or is aberrant. Although prevailing preemption analysis might also weed out conflicting state rules, to call the source federal casts uncertainty over whether, in any particular case, that state's law will apply, or will be found lacking in federal court. Second, characterizing the source as federal binds state courts to follow the federal rule. Third, by entitling the source federal, state conflicts of law rules will not apply, even if the state law is adopted as the federal rule. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Fourth, the characterization and subsequent steps of the analysis relegate state interests to a simple balancing against federal policies rather than requiring a focus on constitutional allocations and unconstitutional infringements of power.

In this case, the open question is one of property law, one of the few areas traditionally left to the states. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 605–08, 93 S.Ct. 2389, 2403–05, 37 L.Ed.2d 187 (1973) (Stewart & Rehnquist, J.J., concurring); *United States v. Yazell*, 382 U.S. 341, 352–58, 86 S.Ct. 500, 506–10, 15 L.Ed.2d 404 (1966); *United States v. Burnison*, 339 U.S. 87, 89, 70 S.Ct. 503, 504, 94 L.Ed. 675 (1950); *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 155–56, 64 S.Ct. 474, 480–81, 88 L.Ed. 635 (1944); *see also Sunderland v. United States*, 266 U.S. 226, 232–34, 45 S.Ct. 64, 65, 69 L.Ed. 259 (1923). The Supreme Court sometimes mentions this tradition of state property control when choosing the federal rule. *E. g. Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *United States v. Brosnan*, 363 U.S. 237, 241–42, 80 S.Ct. 1108, 1111–12, 4 L.Ed.2d 1192 (1960); *RFC v. Beaver County*, 328 U.S. 204, 210, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946). The property question arises be-

---

**4.** In a review of the choice of law cases, one is impressed with how infrequently the source of right is *not* federal. In *United States v. Yazell*, 382 U.S. at 357, 86 S.Ct. at 509, the Court left unanswered whether state law applied of its

own force or as a federal rule. Perhaps if the source of right is state law, the courts immediately move into standard preemption analysis. *See Ferri v. Ackerman*, —— U.S. ——, 100 S.Ct. 402, 62 L.Ed.2d 355, (1979).

tween a Georgia landowner and a privately-owned, Georgia utility company over land in Georgia condemned for a Georgia power project. Grant of a federal license is conditioned on the project's being one that the United States should *not* undertake. 16 U.S.C. § 800(b) (1976). The major purpose of the Federal Power Act was to remove impediments to development of local power plants by granting licensees permission to infringe upon the federal navigational servitude.[5] Under these circumstances state law should govern the definition of just compensation!

It is true that section 21 appears to grant licensees some eminent domain power, though it may be limited. *See Public Utility District No. 1 v. Seattle*, 382 F.2d 666, 669–73 (9th Cir. 1967). *But see Dodson*, 563 F.2d 1178, 1187–88 (5th Cir. 1977). To call the source federal and to apply the choice of law analysis, however, skips the questions of whether Congress can constitutionally act in the property area, and whether Congress can constitutionally delegate the fed-

eral eminent domain power to private individuals or other legal entities and immunize such recipients from the requirements of state law.[6] I would not be so quick to displace state supremacy over property within its borders, especially when the federal interests are so slight.

### B. *State Law Preference*

While I depart from the majority on the route it took, I agree that state law governs. Although "considerations of federalism"[7] provide one ground for preferring state law, another fundamental constitutional principle supports electing state law as the tie breaker. As vital to our system as the notion of federal and state sovereignty is the concept of the separation of powers of the three federal governmental branches. If state law is not utilized, the federal courts must decide whether to fashion a federal rule, a process that may encroach on the legislative powers reserved to Congress.[8] *See Wallis v. Pan American Pe-*

---

**5.** *See Public Utility District No. 1 v. Seattle*, 382 F.2d 666, 671 (9th Cir. 1967). Before the Federal Water Power Act of 1920 was enacted, the Rivers and Harbors Act of 1890 restricted construction of bridges, piers, and abutments on navigable streams. Additional legislation in 1899, 1906, and 1910 allowed construction of dams upon passing of a special bill in Congress but provided no protection for investors and permitted forfeiture or government takeover at any time. *See* H.R.Rep.No.61, 66th Cong., 1st Sess. 2–5 (1919).

**6.** In *Dodson*, the majority concluded that the delegation was constitutional by analogy to the Natural Gas Act, upheld in *Thatcher v. Tennessee Gas Transmission Co.*, 180 F.2d 644 (5th Cir.), *cert. denied*, 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609 (1960). 563 F.2d 1178, 1181. *Cf. Public Utility District No. 1 v. Seattle*, 382 F.2d 666 (9th Cir. 1967) (Congress has not bestowed the full measure of its eminent domain power on licensees, especially since licensees are often private companies operating for profit, not for a national interest).

**7.** The majority finds the roots of federalism in the Rules of Decision Act. As suggested by note 6 of the majority opinion, however, commentators debate whether the Rules of Decision Act applies when the source of law is federal. If the source is federal, "the Constitution or Treaties of the United States or Acts of Congress" may "otherwise require" than that

state laws be rules of decision. *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592–93, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973). *See* Note, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 823, 826 n.23 (1976). Other commentators believe that the Rules of Decision Act incorporates international conflicts of law principles to restrict the "cases where they [state rules] apply" to ones involving intra-territorial situations. R. Bridwell & R. Whitten, *The Constitution and the Common Law* 78–87, 99, 129–30 (1977). Although a question of federal source might involve a totally intrastate transaction, such as this one involving Georgia parties and Georgia property, it also might cover a setting in which choice of state law might force its application to cases with extraterritorial circumstances. Nevertheless, federalism principles do support a preference for choosing state law, regardless of whether those principles are embodied in the Rules of Decision Act or extracted from the Constitution's structuring of the federal system.

**8.** As the majority suggests, a third ground for preferring state law in this case is that the suit is between private parties. The Supreme Court has indicated that, especially when the United States is not a party, a strong conflict is needed to displace state law. *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 31, 97 S.Ct. 2490, 2494, 53 L.Ed.2d 557 (1977); *Bank of America v. Par-*

*troleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966); *United Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 701, 86 S.Ct. 1107, 1110, 16 L.Ed.2d 192 (1966); *United States v. Standard Oil Co.*, 332 U.S. 301, 313–16, 67 S.Ct. 1604, 1610–12, 91 L.Ed. 2067 (1947).[9]

This is not to suggest that federal courts have no power to shape federal common-law rules; the Supreme Court has reaffirmed for almost forty years the judiciary's authority to fill many of the gaps left by Congress.[10] Nor is it suggested that separation of powers principles would require adoption of state law in the face of a significant conflict between that law and federal

directives; under the current framework, the balancing of state and federal interests does not occur until after a determination that state law is not inconsistent with federal goals. Furthermore, I recognize that separation of powers considerations may not carry as much weight for questions such as this one, in which the federal common-law rules have been long evolving without indication of congressional displeasure. It does seem to me, however, that separation of powers principles fortify a general preference for applying a state law rather than creating a federal rule when the weight of federal and state interests is close on balance.[11] If the current framework for ana-

*nell*, 352 U.S. 29, 34, 77 S.Ct. 119, 121, 1 L.Ed.2d 93 (1956). For cases in which federal law was applied when the United States was not a party, however, see *Illinois v. Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (federal rule applied in dispute between states over interstate pollution); *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946) (federal rule of equity applied in federal action between private parties). *See also Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979); *J. I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); ·*Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); *Sola Electric v. Jefferson Electric*, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942). The United States' status as a party, however, certainly does not trigger the automatic generation of a federal rule. *E. g., United States v. Kimbell*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1978); *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966); *United States v. Brosnan,* · 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960).

9. In *Standard Oil*, the Court turned down the opportunity to create a federal rule, but it also rejected use of a state rule. That case is therefore not solid support for a general state law preference, but it does reflect the Court's concern that its rulemaking not infringe on powers best exercised by Congress. *See also* R. Bridwell & R. Whitten, *supra* note 7, at 133–34. These·authors also express the concern that judicial rulemaking rarely takes into account the parties' expectations, which causes unfairly retroactive rulemaking, and uncertainty in the law and in private relations. *Id.* at 133. *See* majority opinion, note 17.

10. *Cf. Cannon v. University of Chicago*, 441 U.S. 677, 730, 745–47, 99 S.Ct. 1946, 1974, 1982–84, 60 L.Ed.2d 560 (Powell, J., dissenting)

(1979) (distinguishing separation of powers problems from choice of law questions). For the view that Congress would be unable to bear the burden of interstitial lawmaking, see Hart, *The Relations Between State and Federal Law*, 54 Colum.L.Rev. 489, 534 (1954). *See also United States v. Little Lake Misere Land Co.*, 412 U.S. at 593, 93 S.Ct. at 2397.

11. The majority states that "the choice of law question in this case is a close one," although federal interests are not "sufficient to overcome [a state law] preference." The question does not appear so close to me. No significant conflict exists that will defeat the purposes of the Federal Power Act. The three articulated federal interests or policies are not unduly hampered by application of state law. Congress itself built into the Act a significant amount of disuniformity. As in *Kimbell*, the federal operations already specifically adapt to state law and involve individual negotiation with landowners, which minimizes the force of Georgia Power's "generalized pleas for uniformity." 440 U.S. at 729–30, 99 S.Ct. at 1459. The Court's statements in *Butner* concerning use of state rules in bankruptcy proceedings have even greater relevance to the Federal Power Act, under which the federal interests are less compelling:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both State and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323.

lyzing choice of law must remain, principles of federalism and separation of powers support favoring state law as the rule of decision.

ALVIN B. RUBIN, Circuit Judge, with whom AINSWORTH, TJOFLAT and FRANK M. JOHNSON, Jr., Circuit Judges, join, dissenting.

Because I fail to perceive any sound reason to distinguish between condemnation proceedings brought by the United States and those in which it authorizes its power to be used by its statutory licensee for a federal public purpose, I respectfully dissent. Federal rules *ex proprio vigore* should apply to such condemnation proceedings for the reasons set forth in the majority opinion in *Georgia Power v. 54.20 Acres of Land*, 563 F.2d 1178 (5th Cir. 1977), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979), and followed in the panel opinion, 596 F.2d 644.

440 U.S. at 55, 99 S.Ct. at 918. Under these circumstances, the state interests outweigh the federal, regardless of whether a general presumption favoring state law is utilized.