962 F.2d 1192
 60 USLW 2692
 COLUMBIA GAS TRANSMISSION CORPORATION, Plaintiff-Appellant,
v.
An EXCLUSIVE NATURAL GAS STORAGE EASEMENT in the Clinton
Subterranean Geological Formation Beneath a 264.12 Acre
Parcel in Plain Township, Wayne County, Ohio; Matthew Kim
McCullough; Luann McCullough; Federal Land Bank of
Louisville; Ross McCullough, Jr.; Phyllis G. McCullough;
Joanne Spiglemire, Treasurer; Unknown Interested Other
Parties to Plaintiff; Universal Exploration, Inc.,
Defendants-Appellees.
 No. 91-3360.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 21, 1991.
Decided April 30, 1992.
Rehearing En Banc Denied
July 23, 1992.
 
 Amos Perrine, Columbia Gas Transmission Corp., Charleston, W.Va., David D. Noble (argued and briefed), John E. Sullivan, III, Noble & Sullivan, Cleveland, Ohio, for Columbia Gas Transmission Corp.
 M. Howard Petricoff (argued and briefed), Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Matthew Kim McCullough and Luann McCullough.
 Robert J. Reynolds, Reynolds & Richard, Wooster, Ohio, for Federal Land Bank of Louisville.
 Joanne Spiglemire, Wooster, Ohio, for Joanne Spiglemire.
 M. Howard Petricoff, Joseph M. Brooker, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Universal Exploration, Inc.
 Before: JONES and MILBURN, Circuit Judges; and ENGEL, Senior Circuit Judge.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 On April 14, 1988, Columbia Gas Transmission Corporation filed suit in the United States District Court for the Northern District of Ohio in Akron seeking to appropriate an exclusive underground natural gas storage easement beneath 264 acres of land in Wayne County, Ohio. Columbia Gas commenced this action pursuant to its eminent domain authority conferred in § 7(h) of the Natural Gas Act. See 15 U.S.C. § 717f(h) (1988).[1] The tract in question is part of a farm owned by defendants Matthew and Luann McCullough.[2] In the present appeal, Columbia Gas challenges the judgment below directing it to pay compensation to defendants in the amount of $213,798. This appeal requires us to address whether this circuit should develop a federal common-law rule as the standard of valuation, or rather, whether the Act requires that we adopt the law of the state in which the property is situated as the appropriate federal standard. For the reasons that follow, we hold that the federal standard should incorporate the law of the state in which the condemned property is located. Because the court below did not follow Ohio law in making its determinations, we reverse and remand for further proceedings.
 
 
 2
 * Columbia Gas is a natural gas company falling within the provisions of the Natural Gas Act, 15 U.S.C. §§ 717-717w (1988). As part of its extensive interstate natural gas distribution and transportation system, Columbia Gas maintains numerous natural gas storage fields throughout the Northeast and Midwest. These storage fields are the remnants of earlier natural gas deposits that have since been depleted. During periods of low demand, Columbia Gas injects natural gas purchased elsewhere into the storage fields for later withdrawal during periods of high demand.
 
 
 3
 The instant suit concerns the Wayne Storage Field in Wayne County, Ohio, located in a geologic stratum, or "horizon," known as the Clinton Formation. The Clinton Formation lies approximately 2800 to 3000 feet beneath the earth's surface and encompasses approximately 21,000 acres. The McCulloughs are owners in fee simple of a 399-acre farm in Wayne County on which they grow grain and raise livestock. Approximately 264 acres of the McCullough farm are located in the "buffer zone" of the Wayne Storage Field[3] and are the subject of the instant condemnation proceedings.
 
 
 4
 Prior to 1987, Columbia Gas held a series of limited-duration underground gas storage leases with the McCulloughs. These leases granted Columbia Gas the exclusive right to use the Clinton Formation beneath the property as a barrier to prevent the escape of gas in the reservoir of the storage field. The final lease expired in 1987, and Columbia Gas and the McCulloughs were thereafter unable to settle on a new lease term. Instead, on March 1, 1988, the McCulloughs entered into a six-month term production lease with Branney Operating Company, which in turn formed a joint venture with Universal Exploration and Petro Evaluation Services. The lease gave Branney Operating the exclusive right to drill, produce, and market all recoverable oil and natural gas from under the McCulloughs' property in exchange for a one-eighth royalty of the proceeds from the sale of all oil and gas recovered, free of the costs of production.
 
 
 5
 On March 28, 1988, Branney Operating assigned all of its rights under the lease to Universal Exploration. After arrangements were well under way to secure the necessary capital and drilling permits, Columbia Gas filed the instant suit condemning the underground storage easement. Columbia Gas feared that defendants' drilling might destroy the permeability barrier containing the stored gas within the field. The effect of the condemnation was to deprive defendants of their right to prospect for oil and gas within and below the Clinton Formation.
 
 
 6
 The district court proposed the empanelling of a commission pursuant to Federal Rule of Civil Procedure 71A(h) to determine the amount of compensation owed defendants. Following a comment period during which both parties proposed instructions, the court appointed a three-person Rule 71A(h) Commission. On May 4, 1990, the court issued an order finalizing the instructions and granting leave to both parties to file objections.
 
 
 7
 At hearings before the Commission, defendants presented expert testimony suggesting that the wells slated for drilling might well prove productive. An expert also predicted that the present interest value of the expected future net income from the proposed wells might reach as high as $873,802. Columbia Gas responded with expert testimony and evidence indicating that the marketplace value of the right to prospect for oil and gas in land comparable to that belonging to defendants was approximately $50 per acre, bringing the total value of the easement to $13,200. Columbia Gas also offered evidence that a fee simple interest in the subject tract, unencumbered by any easements, was worth no more than $154,200.
 
 
 8
 After two days of hearings, the Commission issued its report. The Commission found that "[i]t is more likely than not that commercially recoverable oil and gas reserves exist within the property sought to be appropriated." J.A. at 195. The Commission further found that "the present value, on the date of taking, of the net cash flow from the natural gas reserves from the property sought to be appropriated, discounted at twelve percent (12%), is ... $305,426." Id. at 196. After discounting this amount by 30% due to its determination that the property would more likely than not be classified as "proved undeveloped" reserves, the Commission concluded that just compensation for the condemned property was $213,798. Id.
 
 
 9
 On January 22, 1991, after various post-report motions by both parties, the court ordered the Commission to supplement its report stating the evidentiary basis for its findings. On March 21, 1991, after receiving the Commission's supplemental report, the court upheld the Commission's findings of fact and conclusions of law. Columbia Gas subsequently filed this timely appeal.
 
 II
 
 10
 Columbia Gas's primary contention on appeal is that the Commission applied the improper legal standard in determining the amount of compensation due the defendants. Specifically, Columbia Gas argues that the Commission erred in relying upon the present value of the expected future net income of the planned wells, rather than upon the difference in value of the subject property before and after the condemnation. Before addressing the merits of this claim, however, we must first determine whether this issue should be resolved in accordance with state law, in this case the law of Ohio, or under federal common law.[4]
 
 
 11
 Resolution of this issue follows the analysis set forth in United States v. Kimbell Foods, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), and its progeny. Kimbell involved the priority of competing private and federal liens, some of which arose under federal loan programs, in the absence of a federal statutory scheme setting priorities. Id. at 718, 99 S.Ct. at 1453. The Supreme Court first addressed whether the federal program required that federal law should govern and unequivocally held that it should:
 
 
 12
 Since the agencies [that held the United States' liens] derive their authority to effectuate loan transactions from specific Acts of Congress passed in the exercise of a "constitutional function or power," their rights, as well, should derive from a federal source.... In such contexts, federal interests are sufficiently implicated to warrant the protection of federal law.
 
 
 13
 Id. at 726-27, 99 S.Ct. at 1457-58 (citation omitted) (quoting Clearfield Trust Co. v. United States, 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943)).
 
 
 14
 Given that federal law provided the source of power, the Court next addressed whether the federal courts should fashion a uniform federal common-law rule or adopt state law as the federal standard. Id. at 728, 99 S.Ct. at 1458. The Court enunciated three considerations guiding its analysis: (1) the need for a nationally uniform body of law, (2) whether the application of state law would frustrate specific objectives of the federal program at issue, and (3) the extent to which application of a federal rule would upset commercial relationships predicated on state law. Id. at 728-29, 99 S.Ct. at 1458-59; accord Gaff v. Federal Deposit Ins. Corp., 919 F.2d 384, 387 (6th Cir.1990), modified, 933 F.2d 400 (6th Cir.1991). Reviewing each factor in turn, the Court concluded that state law should be adopted as the appropriate federal rule.
 
 
 15
 Since its decision in Kimbell Foods, the Supreme Court has reaffirmed the continuing vitality of the Kimbell Foods framework. In Kamen v. Kemper Financial Services, --- U.S. ----, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), the Court considered whether federal courts should develop a federal common-law rule requiring a representative shareholder, in a derivative action pursued under the Investment Company Act of 1940, 15 U.S.C.A. §§ 80a-1 to 80a-64 (West 1981 & West Supp.1991), to make a demand on the board of directors, even though such a demand would be excused as futile under state law. Id. at 1714. In a unanimous opinion, the Court first noted that, because the dispute turned on the requirements imposed under a federal statute, the contours of any rules necessary to fill in the gaps of that statute were "necessarily federal in character" and, therefore, governed by federal law. Id. at 1717. The Court added, however, that this was only the beginning of the inquiry:
 
 
 16
 It does not follow, however, that the content of such a rule must be wholly the product of a federal court's own devising. Our cases indicate that a court should endeavor to fill the interstices of federal remedial schemes with uniform rules only when the scheme in question evidences a distinct need for nationwide legal standards, or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand. Otherwise, we have indicated that federal courts should "incorporat[e] [state law] as the federal rule of decision," unless "application of [the particular] state law [in question] would frustrate specific objectives of the federal programs." The presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.
 
 
 17
 Id. (citations omitted) (quoting Kimbell Foods, 440 U.S. at 728, 99 S.Ct. at 1458). Applying this reasoning to the case before it, the Court refused to displace the established state-law futility rule with a uniform federal rule and, consistent with Kimbell Foods' three-step inquiry, found that (1) there was no overriding need for a nationally uniform rule, (2) the futility exception was not inconsistent with the policies underlying the Investment Company Act, and (3) the scope of any demand requirement, federal or state, would necessarily embody the incorporating state's allocation of governing powers within the corporation. Id. at 1719-23.
 
 
 18
 This court has previously applied the Kimbell Foods analysis in choosing between state and federal common law in delineating the contours of federal statutes. See, e.g., United States v. 2525 Leroy Lane, 910 F.2d 343, 347 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991). Taken together, this body of precedent suggests an inclination to adopt state law as the federal standard where a private party brings a federal cause of action implicating areas of traditionally state concern. The narrow issue of whether compensation for a condemnation action brought pursuant to § 717f(h) of the Natural Gas Act should follow state law is, however, a matter of first impression in this circuit.
 
 
 19
 As an initial matter, we have no hesitation concluding, consistent with the threshold Kimbell Foods inquiry, that defining the contours of § 717f(h) is an issue of federal law. The Natural Gas Act is a federal statute implementing a nationwide federal program. Accordingly, its interpretation is a matter of federal law. See Kamen, 111 S.Ct. at 1717; Kimbell Foods, 440 U.S. at 726, 99 S.Ct. at 1457. Less obvious is whether, as a matter of federal law, this Court should fashion a federal common-law rule as the federal standard or instead, adopt the law of the state in which the condemned property is situated.
 
 
 20
 Our analysis begins with the statutory language. Section 717f(h) provides that a private-party holder of a certificate of public convenience such as Columbia Gas may acquire a necessary easement
 
 
 21
 by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated....
 
 
 22
 15 U.S.C. § 717f(h) (emphasis added). The statutory language explicitly provides that federal courts should look to the "practice and procedure" of the state in which the subject property is located in resolving the rights and obligations of parties to an eminent domain action brought under this section. Whether this language can be read as also necessarily incorporating the substance of state law rules for purposes of determining just compensation, however, is arguably open to question. While we are inclined to read the statute as raising a strong presumption that state law does provide the proper measure for such determination, we nevertheless find it useful to look beyond the statute itself, to decisions of other circuits, for guidance.
 
 
 23
 To the best of our knowledge, only one court of appeals has directly addressed whether § 717f(h) incorporates state law as the appropriate federal standard. In Mississippi River Transmission Corp. v. Tabor, 757 F.2d 662 (5th Cir.1985), the Fifth Circuit summarily held that the statutory language of § 717f(h) required that state law be adopted as the federal rule. See id. at 665 n. 3. The court's summary treatment of this issue, however, is best understood in light of the Fifth Circuit's earlier decision in Georgia Power Co. v. 138.30 Acres of Land (Sanders), 617 F.2d 1112 (5th Cir.1980) (en banc), cert. denied, 450 U.S. 936, 101 S.Ct. 1403, 67 L.Ed.2d 372 (1981). In Georgia Power, the court, sitting en banc, addressed whether to fashion a federal rule or adopt state law to determine the amount of compensation due where a private party exercises the power of eminent domain under § 21 of the Federal Power Act. Id. at 1113. In language materially identical to § 717f(h), the Federal Power Act, § 21, see 16 U.S.C. § 814 (1988), mandates that federal courts apply the "practice and procedure" of the state in which the condemnation occurs.[5]
 
 
 24
 Relying on a long line of Supreme Court cases culminating in Kimbell Foods, the court first concluded that the source of the eminent domain power conferred under § 814 was federal. Georgia Power, 617 F.2d at 1115-18. The court then analyzed whether state law should be adopted as the appropriate federal standard. While noting "the existence of important federal interests ... arising under the Federal Power Act," the court found these interests insufficient to warrant the displacement of state law. Id. at 1118. First, the court noted that the legislative history of the Federal Power Act revealed no express congressional intent that federal common law rather than state law supply the federal rule for determining compensation. Second, the court held that, because the project at issue was pursued by a private party, it "does not implicate the interests of the United States to the degree that it is thought desirable that the project be undertaken by the United States itself." Id. Third, the court noted that the incorporation of state law as the appropriate rule would not frustrate the "overriding federal interest at stake" in the case, which was "in implementing or effectuating the federal program." Id. at 1120.[6] The court also observed that a federal common-law rule would not necessarily advance the goal of national uniformity, reasoning that, because a licensee under § 814 often had the option of proceeding under state or federal law, application of a uniform federal standard "could result in a corresponding loss of uniformity even in a single project." Id. at 1122. Finally, the court noted that, "since the question of what constitutes property is usually determined with reference to state law," the state had a strong interest in the resolution of disputes over property rights. Id. at 1123. In light of these observations, the court concluded that the law of the state where the condemned property is located was to be adopted as the appropriate federal rule for determining just compensation. Id. at 1124.
 
 
 25
 At least one other circuit has found Georgia Power persuasive and, accordingly, has adopted its analysis. See National R.R. Passenger Corp. v. Two Parcels of Land, 822 F.2d 1261, 1266-67 (2d Cir.) (adopting Georgia Power analysis, but finding that federal common law should govern Amtrak), cert. denied, 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987).[7] While we read Georgia Power as primarily an elaboration of the analysis propounded in Kimbell Foods and its progeny, we find it instructive to the case at bar and conclude that it points to the same result in this case as well.
 
 
 26
 A number of reasons support adopting state law as the federal standard for determining compensation under § 717f(h). First, property rights have traditionally been, and to a large degree are still, defined in substantial part by state law. See 36 C.J.S. Federal Courts § 189(5) (1960) ("As a general rule, legal interests and rights in property are created and determined by state law.... [Thus,] the courts of the United States have applied state law in cases involving ... the power of eminent domain and its exercise...."). Thus, regardless of the rule chosen in this case, it will invariably derive its essence and much of its practical import from how the parties' property rights have been carved out under state law and how the parties have previously allocated these state-defined property rights. Were we to fashion a federal common-law rule under § 717f(h), the rule, far from offering an analytically distinct and self-contained analysis, would at best merely superimpose a layer of property right allocation onto the already well-developed state property regime. Such a result would carry with it the danger of upsetting the parties' commercial expectations founded upon state law.
 
 
 27
 Second, we are confident that incorporating state law as the federal standard will not frustrate the specific objectives of the Natural Gas Act. The Act declares its purpose as furthering the public interest "in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce." 15 U.S.C. § 717(a). The only conceivable effect that adopting state law as the measure of compensation might have on this purpose would be that condemnors proceeding under the Act might be required to pay more or less than under an alternative federal common-law rule. To the extent that compensation under state law might deviate from that under a federal rule, we believe this variance, in the aggregate, is far too speculative to warrant displacing state law. Furthermore, even if it could be shown that state law might result, on average and over time, in consistently greater or lesser awards, we seriously doubt that the amount would rise to the level of frustrating the specific objectives of the Natural Gas Act.
 
 
 28
 Third, we are unconvinced that fashioning a nationally uniform rule of compensation for private parties exercising their power of eminent domain under the Natural Gas Act is necessary in this case. Any advantages of a uniform rule are outweighed in this case by the considerations discussed above. Moreover, nothing in the statutory scheme of the Act "evidences a distinct need for nationwide legal standards." Kamen, 111 S.Ct. at 1717.
 
 
 29
 Finally, while we reserve deciding that the legislative history of the Act is a proper issue of concern under the Kimbell Foods analysis, we note that the legislative history of § 717f(h) suggests that it was intended to mirror the parallel provision of the Federal Power Act. See H.R.Rep. No. 695, 80th Cong., 1st Sess., reprinted in 1947 U.S.C.C.A.N. 1477, 1477. The court in Georgia Power concluded that the Federal Power Act's legislative history warranted the application of state law. 617 F.2d at 1118.
 
 
 30
 In sum, we conclude that, although condemnation under the Natural Gas Act is a matter of federal law, § 717f(h) incorporates the law of the state in which the condemned property is located in determining the amount of compensation due. Accordingly, we next consider whether the Commission below adopted a measure of compensation that conformed with the law of Ohio.
 
 III
 
 31
 As a general rule, the correct measure of valuation of a partial taking of property is the difference between the property's fair market value immediately before and immediately after the taking. See Powers v. Hazelton & L. Ry., 33 Ohio St. 429, 435 (1878); American La. Pipe Line Co. v. Kennerk, 103 Ohio App. 133, 3 O.O.2d 201, 144 N.E.2d 660, 665 (1957). Under Ohio law, mineral deposits are generally not subject to valuation separate and apart from the land in which they are located. Board of Park Comm'rs v. DeBolt, 15 Ohio St.3d 376, 15 OBR 494, 474 N.E.2d 317, 319 (1984). Thus, while "it is proper to admit evidence that the land contains valuable mineral deposits, ... the award may not be reached by separately evaluating the land and the deposits." Preston v. Stover Leslie Flying Serv. (In re Appropriation of Easements for Highway Purposes), 174 Ohio St. 441, 23 O.O.2d 100, 190 N.E.2d 446, 450 (1963). In Preston, the Ohio Supreme Court explained the reason for this rule as follows:
 
 
 32
 The underlying basis for rejecting evidence of the value of minerals separate and apart from the overall value of the land is that it involves an estimation of the future profits to be derived from the mining and marketing of such minerals. This is in accordance with the established principle in Ohio that evidence of damages by way of loss of profits is too speculative in character.
 
 
 33
 Id. 190 N.E.2d at 450; see also DeBolt, 474 N.E.2d at 319 (noting that "the loss of future profits to be derived from a commercial venture operated upon appropriated land is generally not subject to reasonably accurate proof"). The Preston court qualified its holding by noting that recovery of future profits might be permitted "if proved with reasonable exactitude," but that such recovery was allowable only where the evidence "is of such a character as to take the determination of damages out of the field of speculation." 190 N.E.2d at 451. As a result, the court found that the trial court erred in instructing the jury that it could award compensation on the basis of expected future net profits for the minerals, id. at 453, and held that a condemnee is entitled only to the fair market value of his or her land, defined as "the price which would be agreed upon at a voluntary sale by an owner willing to sell to a purchaser willing to buy," id. at 452.
 
 
 34
 More recently, in Board of Park Commissioners v. DeBolt, the Ohio Supreme Court distinguished Preston to hold that a contract for timber located on appropriated land constitutes a distinct asset and is subject to separate valuation apart from the land on which the timber is situated. DeBolt, 474 N.E.2d at 319. The court based its holding on the principle that a party is entitled to compensation for the value of a contract where "the contract rights of the party seeking compensation flow[ ] directly from its interest in the property which was taken." Id. Thus, where a party does not hold a "direct interest in the res which was taken," the party is not entitled to compensation. Id. at 319-20. The court also seemed swayed by the fact that the timber in this case was readily capable of reasonably precise calculation, thus removing it from the rationale underlying the general rule refusing valuation of minerals, that "the determination of the market value of such items is too dependent upon speculation on [sic] future events." Id. at 319.
 
 
 35
 We are inclined to believe that the facts of the instant case lie somewhere between the general before-and-after rule of valuation and the exception articulated in DeBolt. The McCulloughs entered into a contract with Branney Operating for the recovery and sale of oil and gas deposits on their land, for which the McCulloughs were to receive a one-eighth royalty of net profits. By frustrating the McCulloughs ability to access these reserves, Columbia Gas appropriated their contract rights, which were tied directly to the condemned property. On the other hand, the precise value of the contract, turning as it did on expected future income from the projected wells, seems substantially more speculative than the timber contract at issue in DeBolt, thus arguably placing the contract within the general rule announced in Preston. Moreover, it is unclear whether DeBolt would require compensation for Universal Exploration's interest in the contract, as its contract rights arguably did not flow directly from a property interest that it held in the condemned property.
 
 
 36
 Where precisely this case falls, however, is an issue we conclude is best resolved below, as we find that a remand is necessary on the ground that the Commission failed to apply the law of Ohio. In its instructions to the Commission, the district court submitted four alternative methods according to which the Commission could determine the fair market value of the easement. Although the court instructed that the Commission could determine compensation based on "the difference in the fair market value of the entire condemned tract before and after the taking," J.A. at 120, the court also instructed the Commission, over the objection of Columbia Gas, that it was equally free to award defendants the present value of the expected future net income of the proposed wells for their productive lives, id. at 119 ("[I]n fixing just compensation, you would determine the probable revenues and costs for the production and sale of native natural gas from the condemned tract and reduce the net sales value by the interest the landowners will enjoy for an early, one time payment."). In addition, the instructions gave no indication that an award under the latter method might be inappropriate if the reserves were unreasonably speculative, nor did they clarify that only the McCulloughs, and not Universal Exploration, might be entitled to compensation for the value of the contract.
 
 
 37
 Upon review, we conclude that these instructions were insufficient as a matter of law. The instructions did not inform the Commission, in accordance with Ohio law, that a condemnee may ordinarily not be compensated merely on the basis of expected future profits that might be realized from the mining and marketing of mineral deposits located on his land. Preston, 190 N.E.2d at 450. Moreover, the instructions failed to clarify that the McCulloughs were entitled to compensation for their contract with the drilling companies only if the value of the contract was not dependent upon uncertain future events. DeBolt, 474 N.E.2d at 319. Finally, the instructions failed to alert the Commission that, even if the contract was capable of sufficiently precise valuation, only those defendants whose contract rights flowed directly from their interest in the condemned easement were entitled to compensation. Id. at 319-20.
 
 
 38
 Our review of the record also supports a remand. Columbia Gas presented essentially uncontested expert testimony that the right to prospect for oil and gas on land comparable to the subject parcel was valued at no greater than fifty-three dollars per acre. Given that Columbia Gas condemned an easement under 264 acres of the Mcculloughs farm, this suggests that the diminution in value of the land flowing from the easement was approximately $13,992, far less than the $213,798 awarded by the Commission.
 
 
 39
 Columbia Gas also offered unchallenged evidence that the fair market value of the 264 acres of land under which the easement was located did not exceed $154,200. Naturally, defendants' failure to rebut this evidence may well have rested on their mistaken assumption that they were entitled to present value of expected future income from the proposed wells. Thus, rather than modify the amount awarded below, we believe that a new trial is necessary to give the parties a full and fair opportunity to present evidence in accordance with Ohio law.
 
 
 40
 As a final matter, Columbia Gas raises a number of challenges to the Commission's factual findings, and argues that the Commission failed to state adequately the basis for its findings. Given our conclusion that legal errors in the instructions to the Commission mandate a new trial, it is not necessary for us to reach these issues.
 
 IV
 
 41
 For the foregoing reasons, we REVERSE the judgment below, VACATE the award of $213,798 to defendants, and REMAND for a new trial consistent with this opinion.
 
 
 
 [1]
 The parties agree that Columbia Gas falls within the provisions of 15 U.S.C. § 717f(h) and, accordingly, had the right to appropriate the easement. This circuit has held that an operator of a federally certified underground gas storage field has the right to condemn underground gas storage easements. Columbia Gas Transmission v. Exclusive Gas Storage Easement, 776 F.2d 125, 129 (6th Cir.1985)
 
 
 [2]
 Also appearing as codefendants are Federal Land Bank of Louisville, Ross McCullough, Jr., Phyllis G. McCullough, Joanne Spiglemire, and Universal Exploration, Inc. (collectively, "defendants")
 
 
 [3]
 The "buffer zone" is a concentric area 5000 feet in width comprising the area immediately within the outer perimeter of the boundary of the Field. The buffer zone allows for the margin of error in the determination of the reservoir boundary
 
 
 [4]
 Although neither party addressed this issue in its argument before this Court, both apparently assuming that federal common law provided the proper standard, we nevertheless recognize that we can, and indeed must, address this issue before proceeding to the merits of the dispute. See Kamen v. Kemper Fin. Servs., --- U.S. ----, ----, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991) (holding that, despite party's failure to raise issue of whether state or federal law provided proper standard, court of appeals "was not free to promulgate a federal common law ... rule without identifying the proper source of federal common law")
 
 
 [5]
 16 U.S.C. § 814 provides that a party exercising the right of eminent domain under the Federal Power Act may proceed
 in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated....
 16 U.S.C. § 814.
 
 
 [6]
 The court also held that, while the application of state law might result in higher costs to the condemnor, that possibility did not "amount[ ] to the kind of conflict which [would] preclude[ ] adoption of state law." Id. at 1121
 
 
 [7]
 In United States v. 33.5 Acres of Land, 789 F.2d 1396, 1400 (9th Cir.1986), the Ninth Circuit distinguished Georgia Power and refused to adopt its reasoning on the ground that the condemnor in its case was the United States rather than a private party