[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11995

_____

SABAL TRAIL TRANSMISSION, LLC,

Plaintiff-Appellant,

*versus*

18.27 ACRES OF LAND IN LEVY COUNTY,
LEE A. THOMAS AS SUCCESSOR SOLE TRUSTEE
OF THE TRUST AGREEMENT FOR LEE A. THOMAS
DATED OCTOBER 1, 2003,
LEE A. THOMAS AS SUCCESSOR SOLE TRUSTEE
OF THE TRUST AGREMENT FOR BEVERLY J. THOMAS
DATED OCTOBER 1, 2003,
RYAN B. THOMAS,
DRUMMOND COMMUNITY BANK,
UNKNOWN OWNERS IF ANY,

2                    Opinion of the Court                    21-11995

PNC BANK, NATIONAL ASSOCIATION,

                                                    Defendants-Appellees,

WILBUR F. DEAN,

                                                    Defendant.

_____

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:16-cv-00093-MW-GRJ

_____

_____

No. 21-11998

_____

SABAL TRAIL TRANSMISSION, LLC,

                                                    Plaintiff-Appellant,

*versus*

2.468 ACRES OF LAND IN LEVY COUNTY FLORIDA,
RYAN B. THOMAS,

FARM SERVICE AGENCY UNITED STATES DEPARTMENT OF

AGRICULTURE ACTING ON BEHALF OF UNITED STATES OF AMERICA,

UNKNOWN OWNERS IF ANY,

                                                    Defendants-Appellees.

————————————

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:16-cv-00095-MW-GRJ

————————————

Before JORDAN and ROSENBAUM, Circuit Judges, and STEELE, District Judge.[*]

ROSENBAUM, Circuit Judge:

———————————

[*] The Honorable John Steele, United States District Judge for the Middle District of Florida, sitting by designation.

This case is all about our prior-precedent rule. As any practitioner before our Court knows, once a panel—or in this case, the en banc Court—has decided an issue in a published decision, that decision is binding on all future panels. That is so because, as a court of law, we aim for rules to be clear, consistent, and predictable. So when our prior-precedent rule applies, it doesn't matter whether we agree with our earlier decision or not. It doesn't matter whether the prior panel or en banc Court missed an argument or overlooked a reason. It doesn't matter if the current panel thinks the earlier decision was wrong. The current panel must follow the earlier decision.

Here, the parties dispute whether, in a condemnation action where a private entity uses the federal eminent-domain power under the Natural Gas Act, § 15 U.S.C. § 717f(h), federal law or state law supplies the rule of decision in determining what compensation the condemnor must pay the landowner. In this instance, the state's substantive law would provide more compensation than would federal law because the state (Florida) law defines compensation for condemnation as including attorney's fees. Federal law doesn't.

But in resolving this question, all the action takes place in determining whether and, if so, how our predecessor Court's precedent, *Georgia Power Company v. Sanders*, 617 F.2d 1112 (5th Cir.

1980) (en banc)[1], controls our analysis. As it turns out, *Georgia Power* applies. And the facts and administrative scheme involved in that case are so close to those in this one that it's almost like we are deciding the same case again—only this time we are bound by precedent. Because *Georgia Power* applies here, it's game over: *Georgia Power* necessarily dictates the answer. And that answer requires us to choose state law to supply the federal law on the meaning of "compensation" under 15 U.S.C. § 717f(h) of the Natural Gas Act.

After a thorough review of the record and with the benefit of oral argument, we therefore affirm the district court's judgment.

## I.    BACKGROUND

Plaintiff-Appellant Sabal Trail Transmission, LLC ("Sabal Trail"), is a natural-gas company that has a "certificate of public convenience and necessity" from the Federal Energy Regulatory Commission ("FERC")[2] under the Natural Gas Act. *See* 15 U.S.C.

---

[1] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[2] The Natural Gas Act does not refer to FERC specifically. Rather, the statute entrusted the power to grant certificates of public convenience and necessity to the Federal Power Commission. *See* 15 U.S.C. § 717a(9). But in 1977, when the Department of Energy was created, Congress transferred the power to grant such certificates to FERC, which is housed within the Department of Energy. *See* 42 U.S.C. § 7172(a)(D).

§ 717f(c).  A natural-gas company with such a certificate can exercise eminent-domain power to construct, operate, and maintain natural-gas pipelines.[3]  *Id.* § 717f(h).  Some states, like Florida, authorize these licensees to exercise the eminent-domain power of the state to condemn property for the purpose of constructing or maintaining natural-gas pipelines.  *See, e.g.*, Fla. Stat. § 361.05.  Similarly, Section 717f(h) is a delegation to private parties of the federal government's eminent-domain authority.  *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2254 (2021) ("Since the founding, the Federal Government has exercised its eminent domain authority through both its own officers and private delegatees. . . . Section 717f(h) is an unexceptional instance of this established practice.").  So often, private licensees have the option of

---

[3] **(h) Right of eminent domain for construction of pipelines, etc.**

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.

15 U.S.C. § 717f(h).

using state or federal eminent-domain authority to condemn property for use in constructing or maintaining natural-gas pipelines.

Acting under the federal eminent-domain authority, in 2016, Sabal Trail sued to condemn easements on two tracts of land so it could build a natural-gas pipeline through two adjacent properties in Levy County, Florida: an 837-acre farm that Defendant-Appellee Lee Thomas owned and a 40-acre residential tract Lee's son, Defendant-Appellee Ryan Thomas (together, the "Thomas family"), owned. *See Sabal Trail Transmission, LLC v. 18.27 Acres of Land in Levy Cnty.*, 824 F. App'x 621, 623 (11th Cir. 2020) (hereinafter, *Sabal Trail I*). The Thomas family grows watermelons and peanuts, tends cattle, and boards horses on the farm. *Id.* Ryan[4] operates the farm and lives on the adjoining 40-acre tract with his two children. *Id.*

After Sabal Trail filed the condemnation actions, the district court granted it immediate possession of the land. *Id.* at 623–24. Sabal Trail then built the pipeline across the two properties. *Id.* at 624.

Sabal Trail and the Thomas family could not agree on compensation for the taking, so the district court held a jury trial on that issue. *Id.* The jury awarded $861,264 to Lee, including $782,083 in severance damages for the loss in value the pipeline caused to the remainder of the property. *Id.* It awarded $463,439

---

[4] To avoid confusion, we refer to the individual Thomases by their first names.

to Ryan, including $451,654 in severance damages. *Id.* Besides the severance damages, the district court also ruled that the Thomas family would be entitled to attorney's fees and costs, though it hadn't yet awarded them. *Id.* at 625.

Sabal Trail appealed. *See Sabal Trail I*, 824 F. App'x 621. Among other things, it sought a new trial on the ground that the district court gave erroneous jury instructions and allowed opposing counsel to make improper arguments by referring to Florida's "full compensation" standard rather than the United States's "just compensation" standard. Sabal Trail also challenged the ruling on attorney's fees and costs.

We held that, even assuming the references to "full compensation" were erroneous, Sabal Trail failed to show prejudice from them because it did not "identif[y] any differences between the federal and state standards for measuring land value or severance damages that are relevant to this case." *Id.* at 626. We also noted that Sabal Trail failed to object to opposing counsel's closing statement at trial, and it was unable to meet the high plain-error standard of review. Finally, we determined, that because the district had not yet set an amount for attorney's fees and costs, it had not yet rendered a "final decision" on that particular matter, so we lacked jurisdiction to review it. We explained that exercising pendent appellate jurisdiction was inappropriate because the attorney's fees arguments were not inextricably intertwined with the other issues on appeal. Rather, we said that the trial issues on appeal at that time required us to determine whether Sabal Trail suffered

prejudice, while the issue of attorney's fees "turned on whether federal or state law supplies the applicable rule of decision." *Id.* at 627.

So in sum, we affirmed the judgments awarding compensation to the Thomas family for the value of the condemned land and dismissed Sabal Trail's appeal of the court's ruling that it would have to pay attorney's fees and costs.

On remand to the district court, the parties briefed the issue of attorney's fees and costs. Sabal Trail opposed awarding them, arguing again that the U.S. Constitution's "just compensation" standard should apply and that that standard did not include attorney's fees and costs. The district court rejected Sabal Trail's position, instead concluding that "state substantive law governs the measure of compensation in eminent domain cases brought by private parties against private property owners under the [NGA]." It then awarded over $765,000 in total fees and costs for both actions. Sabal Trail appeals.[5]

## II.    STANDARD OF REVIEW

The question of whether state law or federal law provides the rule of decision to determine whether the Thomas family is

---

[5] Prior to briefing and oral arguments, we consolidated these appeals: *Sabal Trail Transmission, LLC v. +/-18.27 Acres of Land in Levy County, Florida, et al.*, Case Number 21-11995 and *Sabal Trail Transmission, LLC v. 2.468 Acres of Land in Levy County, Florida, et al.*, Case Number 21-11998.

entitled to attorney's fees and costs is a question of law that we review de novo. *S. Nat. Gas Co. v. Land, Cullman Cnty.*, 197 F.3d 1368, 1372 (11th Cir. 1999).

## III.    DISCUSSION

We divide our discussion into five parts. In Section A, we analyze the statutory text. In Section B, we review our Circuit's prior-panel precedent rule. Section C discusses *Georgia Power*. In Section D, we explain why our prior-panel precedent rule requires us to conclude that *Georgia Power* controls this case and demands the conclusion that state law supplies the substantive rule for determining compensation in condemnation actions under the Natural Gas Act. And in Section E, we address Sabal Trail's counterarguments to applying *Georgia Power*.

### A.  *The Text of the Natural Gas Act is Inconclusive.*

In statutory-construction cases, we first consider the statutory text. *Dixon v. United States*, 900 F.3d 1257, 1263–64 (11th Cir. 2018). If it clearly answers our question, our task ends with the text as well. *Id.*

In relevant part, the Natural Gas Act provides,

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the

compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.

15 U.S.C. § 717f(h). Here, the Natural Gas Act does not say whether federal or state law supplies the standard for determining compensation in a condemnation action that a Natural Gas Act licensee institutes relying on the federal power of eminent domain. It is totally silent on the question. And though this section of the Natural Gas Act was last amended in 1988, subsection (h) wasn't touched. *See* Pub. L. No. 474, 102 Stat. 2302 (Oct. 6, 1988).

But at the same time, other sections of the Natural Gas Act *do* answer the question as it relates to them. For instance, § 717y—added in 1978—was intended to "to facilitate voluntary conversion of facilities from the use of natural gas to the use of heavy petroleum fuel oil." 15 U.S.C. § 717y(a)(1). And that section authorizes FERC "to determine the maximum consideration permitted as just compensation under this section," *id.* § 717y(b)(2). In other words, by designating FERC as the supplier of the meaning of

"compensation" under Section 717y, the section provides that the measure of compensation is determined under a federal rule.

Yet notably, Section 717y authorizes FERC to determine the meaning of "just compensation" only as it pertains to voluntary conversions under "this section," meaning Section 717y. So Section 717y doesn't control our case because it applies to only voluntary conversions brought under it, not, as here, involuntary condemnations brought under Section 717f(h).

Still, Section 717y's selection of the federal rule is interesting for a different reason. Namely, Section 717y shows that Congress knew how to expressly designate a federal standard as the measure of compensation under the Natural Gas Act. Yet it did not do so in the context of condemnation proceedings. And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration omitted and quotation marks omitted). Indeed, we have said that "[w]here Congress knows how to say something but chooses not to, its silence is controlling." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1218 (11th Cir. 2015) (internal citation and quotation marks omitted).

Given that silence here, we conclude that Congress has left a gap in the statute on whether state law or federal law should supply the measure of compensation in condemnation proceedings under the Natural Gas Act. *See Ga. Power*, 617 F.2d at 1115. And

21-11995                Opinion of the Court                13

when "the statute does not specify the appropriate rule of decision, the task of interstitial federal lawmaking falls upon the federal judiciary . . . to declare the governing law in an area comprising issues substantially related to an established program of government operation." *Id.* (cleaned up).

We therefore turn to that task.  But we don't write on a blank slate because of the prior-precedent rule.

B.  *We abide by the prior-precedent rule, which means a prior decision of ours binds future panels unless it is overruled by the Court sitting en banc or by a Supreme Court decision that is "clearly on point."*

From the earliest days of our Circuit's existence, we have followed what has come to be known as the prior-precedent rule. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted "the absolute rule that a prior decision of the circuit (panel or en banc) [can]not be overruled by a panel but only by the court sitting en banc."  Even a later Supreme Court decision does not provide a basis for failing to follow prior precedent unless the Supreme Court decision is "clearly on point." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003).  And even then, the Supreme Court decision must "actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel." *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009).

Not only that, but our prior-precedent rule has no exception when a later panel "is convinced the prior one reached the wrong result—for whatever reason." *Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001). Indeed, we have "categorically reject[ed] any exception to the prior panel precedent rule based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at that time."[6] *Id.* And our prior-precedent rule also requires us to "follow the reasoning behind a prior holding if we cannot distinguish the facts or law of the case under consideration—even if the present case does not involve precisely the same issue." *Devengoechea v. Bolivarian Rep. of Venezuela*, 889 F.3d 1213, 1227 (11th Cir. 2018).

We have often explained the reasons for the prior-precedent rule. For example, in *Bonner v. City of Prichard*, we emphasized the need for "[s]tability and predictability" in the "proper operation of law," and we explained that the prior-precedent rule "maintain[s]" and "promote[s]" these essential factors. 661 F.2d at 1210. As the Supreme Court has reasoned, following past decisions is important. This practice "furnish[es] a clear guide for the conduct of

---

[6] We have referred to this rule by the interchangeable names of the "prior-panel-precedent rule," *see, e.g., Smith*, 236 F.3d at 1303, and the "prior-precedent rule," *see, e.g., United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008). We refer to the rule here as the "prior-precedent rule" because the prior precedent that controls this case—*Georgia Power*—is not a panel precedent but an en banc precedent. So we think the moniker "prior-precedent rule" more accurately reflects the rule we are applying here.

individuals, to enable them to plan their affairs with assurance against untoward surprise; . . . further[s] fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and . . . maintain[s] public faith in the judiciary as a source of impersonal and reasoned judgments." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403 (1970).

In sum, as our colleague Judge Ed Carnes memorably penned, "Without the [prior-precedent] rule every sitting of this court would be a series of do-overs, the judicial equivalent of the movie 'Groundhog Day.'  While endlessly recurring fresh starts is an entertaining premise for a romantic comedy, it would not be a good way to run a multi-member court that sits in panels." *Atl. Sounding Co. v. Townsend*, 496 F.3d 1282, 1286 (11th Cir. 2007) (E. Carnes, J., concurring).  We therefore put Punxsutawney Phil aside and adhere to the prior-precedent rule.

## C.  In Georgia Power, we determined that state substantive law should govern the meaning of "compensation" as used in the Federal Power Act.

With our prior-precedent rule in mind, we review our decision in *Georgia Power*, the decision that we conclude controls the analytical framework here because of the similarity between the statute there and the one here.

*Georgia Power* arose under the Federal Power Act, 16 U.S.C. § 791a *et seq*.  Under the Federal Power Act at that time, the Federal Power Commission (now the Federal Energy Regulation

16                    Opinion of the Court                    21-11995

Commission (we refer to the Federal Power Commission and its successor, the Federal Energy Regulation Commission, as the "Commission")) had the authority to issue licenses to (among others) private companies for the purposes of building, operating, or maintaining water-related projects that were "necessary or convenient for the development and improvement of navigation" or "for the development, transmission, and utilization of power across, along, from, or in" any waterways over which Congress has jurisdiction." *Ga. Power*, 617 F.2d at 1114 n.2 (quoting 16 U.S.C. § 797(e) (1976)) (quotation marks omitted).

Through the Federal Power Act, Congress delegated to these licensees the federal authority to exercise the right of eminent domain under certain circumstances, so they could proceed with construction, operation, or maintenance of water-related power projects. *Id.* at 1114. Under this authority, licensee Georgia Power Company, a privately owned Georgia utility, began condemnation proceedings in federal court against Georgia landowners. *Id.* Georgia Power sought to acquire land for its Lake Wallace hydro-electric-power-generating project. *Id.*

Employing the condemnation procedures of what was then Rule 71A,[7] FED. R. CIV. P. 71.1, the district court appointed a three-

---

[7] Rule 71A has since been redesignated Rule 71.1. *See* FED. R. CIV. P. 71.1 Advisory Committee Notes for 2007 amendment. By its terms, Rule 71.1 "govern[s] proceedings to condemn real and personal property by eminent domain, except as [Rule 71.1] provides otherwise."

member commission to determine how much compensation the landowners were entitled to. *Ga. Power*, 617 F.2d at 1114. As it turned out, the landowners were entitled to more money under Georgia law than they were under federal law. *See id.* at 1115. So our predecessor Court had to decide whether federal or state law supplied the substantive law for determining the landowners' compensation under the Federal Power Act. *Id.*

We addressed the issue in two parts. *See id.* First, we found it "clear that the source of the eminent domain power at issue [t]here [was] federal." *Id.* As we explained, the licensees "derive[d] their authority to exercise the power of eminent domain from the Federal Power Act, which was passed in the exercise of a constitutional function or power." *Id.* (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979) (citations omitted)) (quotation marks omitted). So, we reasoned, the licensees' rights also "derive[d] from a federal source." *Ga. Power*, 617 F.2d at 1115. And for those reasons, federal law governed. *See id.*

But that conclusion did not end our inquiry. Even though the Federal Power Act used the federal eminent-domain power, we observed that the Federal Power Act did not specify whether the state or federal measure of compensation applied in a private condemnation action under it. *Id.* In the absence of such an indication in the governing statute, we said it was up to us to fill that gap and "declare the governing law in an area comprising issues substantially related to an established program of government operation." *Id.* (internal citation and quotation marks omitted). We explained

that our choice for the federal substantive law on the measure of compensation in private-licensee condemnation actions was between federal common law and state law. *Id.*

Before beginning the analysis of whether federal or state law should fill the gap, we started with a presumption of sorts: that a tie would go to state law. To explain why, we began with "[b]asic considerations of federalism, as embodied in the Rules of Decision Act." *Id.* at 1115–16. We noted that the Rules of Decision Act instructs that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." *Id.* at 1116 n.5. Then we reviewed Supreme Court precedent and concluded that it evidenced "a growing desire to minimize displacement of state law." *Id.* at 1118 (citation and quotation marks omitted).

Given this backdrop, we started the rest of our analysis from "the premise that state law should supply the federal rule." *Id.* at 1116. But we said this premise could be defeated by a showing of (1) contrary legislative intent or (2) "other sufficient reasons . . . to displace state law with federal common law." *Id.* at 1118.

As to "express congressional intent," we found none that Congress intended for federal common law, as opposed to state law, to govern the determination of compensation in a condemnation action under the Federal Power Act. *Id.* So we moved on to

the next inquiry: whether "other sufficient reasons" warranted "displac[ing] state law with federal common law." *Id.*

To answer that question, we analyzed the problem in three steps. *See id.* at 1118–24. *One*, we identified the "specific governmental interests" in play. *Id.* at 1118–21. *Two*, we considered whether applying state law would "virtually . . . nullify the federal objectives," *see id.* at 1118, along the way evaluating whether the Federal Power Act required, in defining "compensation," the uniformity that federal law provides. *Id.* at 1121–23. If the answer to either question was "yes," we said, that would amount to "a conflict that preclude[d] application of state law." *Id.* at 1118. But if the answers to both questions was "no," then *three*, we examined "the relative strength of the state's interests in having its rules applied." *Id.* at 1123–24.

At the first step, we acknowledged "the existence of important federal interests in issues arising under the Federal Power Act." *Id.* Indeed, we said "[t]he overriding federal interest at stake in a case such as this one is in implementing or effectuating the federal program." *Id.* at 1120. More specifically, we identified the federal interests or policies under the Federal Power Act as follows: "1) maximization of hydroelectric development, 2) reduced energy costs and 3) minimization of cost to the government should it decide to exercise its option to acquire a project at the expiration of the license term . . . ." *Id.*

At the second step, we determined that applying state law "to the narrow question of the determination of the amount of

compensation a licensee must pay a landowner does not result in a conflict which would preclude application of state law." *Id.* at 1121. That is, applying state law to the meaning of "compensation" wouldn't nullify the Federal Power Act's objective, nor did the Federal Power Act require uniformity.

On the latter point, we considered whether the Federal Power Act required the uniformity of federal common law. *See id.* at 1121–22. Of course, we recognized that "[i]n any case involving the issue of choice of federal or state law, the desirability of uniformity achieved by application of federal common law may be advanced." *Id.* at 1121. Still, though, we found that uniformity bore "little relation to the federal program at issue." *Id.* In fact, we observed that the Federal Power Act did not "represent an attempt by Congress to provide for application of uniform national law to all aspects of hydroelectric development under the Act." *Id.* at 1121 n.14. Rather, we said, Congress sought "to promote the long needed development of water power." *Id.* So, while uniformity is *always* helpful, we said, it wasn't a particularly salient consideration when it came to the meaning of "compensation" in private condemnation actions under the Federal Power Act.

In further support of our conclusion, we noted that the Federal Power Act "integrat[ed] . . . state and federal jurisdiction, which carefully preserve[d] the separate interests of the states." *Id.* As examples of this, we pointed to 16 U.S.C. §§ 812 and 813, which "expressly limit[ed] the Commission's authority to regulate rates and other charges, which are directly related to energy costs, to

situations where a state does not have its own regulations." *Id.* This example, we said, highlighted "the absence of intent to apply uniform federal law to the compensation question." *Id.*

We also had a third reason why uniformity wasn't especially important on the compensation question. We observed that a licensee under the Federal Power Act "often has the option of utilizing either state or federal eminent domain power (as Georgia Power Company ha[d] with respect to most, if not all, of the land taken for the [project at issue there]." *Id.* at 1122. So, we reasoned, applying federal law "could result in a corresponding loss of uniformity even in a single project." *Id.* Based on these realities, we assumed any advantage of applying either federal or state law over the other "arguably cancel[ed] out the advantage otherwise gained," so we viewed the uniformity inquiry as a wash. *Id.* at 1123.

As to the "nullifying federal objectives" prong of step two, we acknowledged that applying state law would result in higher compensation awards to the landowners. *Id.* at 1121. But we said that did not "amount[] to the kind of conflict which precluded adoption of state law . . . ." *Id.* Still, we recognized that applying state law resulting in higher condemnation costs to the licensee "arguably burden[ed] or interfere[d] with the three [specified] federal interests or policies." *Id.* So we proceeded to the third step—"weigh[ing] the federal interest in avoiding this interference against the state interest in having its law applied." *Id.*

At the third step, we emphasized that property rights—which condemnation implicates—have "traditionally been an area of local concern." *Id.* at 1123. As we explained, "property has been viewed as a bundle of valuable rights and [ ] the question of what constitutes property is usually determined with reference to state law." *Id.* Given those circumstances, "we [thought] it consistent that the value of those [property] rights also be determined with reference to state law." *Id.* We further reasoned that states also "have an interest in providing economical energy to their citizens," so "accommodating that interest with that of insuring that their condemnee-landowner citizens are compensated in accord with their (states') views of what is just, are entitled to weight." *Id.*

As to Georgia Power's argument that increased compensation costs would cause increased power costs down the line to consumers, we rejected that as a basis for discounting the states' interests in applying state compensation law. *Id.* at 1123–24. We explained that applying federal law because it decreased the cost of power to the consumer would "require certain Georgia landowners partially to subsidize a private Georgia utility and consumers of electric power in a way which would not be required of them if Georgia law were applied." *Id.* And because we found no "indication of specific legislative intent to impose such a burden on Georgia landowners," we declined to "presume that Congress would have balanced the interests of private licensees and consumers of hydroelectric power, on the one hand, and the property owners,

on the other hand," differently from how Georgia's laws "balance such interests." *Id.*

For these reasons, we ultimately concluded that "the showing of federal interests and the effects thereon of applying state law [were not] sufficient to overcome" the "preference" for applying state law. *Id.*

### D. *Georgia Power requires the conclusion that state law provides the meaning of "compensation" in a condemnation action under Section 717f(h) of the Natural Gas Act.*

We now turn to the issue of compensation in private condemnation actions under the Natural Gas Act.

We proceed in two steps. *First*, we recognize that *Georgia Power* supplies the framework for analyzing whether we apply federal or state law as the substantive federal law on the meaning of "compensation" in condemnation actions under the Natural Gas Act. And *second*, we apply *Georgia Power*'s framework to the Natural Gas Act.

#### 1.  *Georgia Power*'s framework controls this case.

*Georgia Power* supplies the framework to decide this case. Both *Georgia Power* and this case involve the same question: whether to use federal common law or state law as the substantive measure of compensation under federal statutes that delegate the federal government's eminent-domain power to private licensees.

Even though the Natural Gas Act and the Federal Power Act are different, they are not different in any way meaningful to our analysis. *One,* both Acts empower the Commission to award licenses to private entities to construct, operate, and maintain facilities necessary to our nation's energy needs. *Compare* 16 U.S.C. § 797(e)*, with* 15 U.S.C. § 717f(e). *Two*, Congress intended that the two statutes allow private licensees to exercise the federal eminent-domain power in a co-extensive way. As we discuss more below, *see infra* at 25–27, Congress amended the Natural Gas Act to make the delegation of the federal eminent-domain power function the same way as it does under the Federal Power Act. *Three*, both Acts delegate the federal government's eminent-domain power to the private licensees. *Compare* 16 U.S.C. § 814*, with* 15 U.S.C. § 717f(h). And, *four*, neither specifies whether federal or state law supplies the federal substantive law on the meaning of compensation in such actions. *Compare* 16 U.S.C. § 814*, with* 15 U.S.C. § 717f(h).

So we must apply *Georgia Power*'s analytical framework here to determine whether federal common law or state law supplies the substantive federal law on the meaning of compensation under the Natural Gas Act. But as it turns out the parallels between the Federal Power Act and the Natural Gas Act are so close in all the ways material under *Georgia Power*'s analytical framework, that our prior-precedent rule requires us to reach the same answer here as we did in *Georgia Power*.

2.  Applying *Georgia Power* to the Natural Gas Act

We approach the question on compensation in two parts, with the second part of our analysis divided into three steps.

At the first part, as we did in *Georgia Power*, we find it "clear that the source of the eminent domain power at issue here is federal." 617 F.2d at 1115.  That is so because the licensees under the Natural Gas Act "derive their authority to exercise the power of eminent domain from [a federal statute—this time, the Natural Gas Act], which was passed in the exercise of a constitutional function or power." *Id.*  After all, the Natural Gas Act "is a federal statute implementing a nationwide federal program." *Tenn. Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres*, 931 F.3d 237, 247 (3d Cir. 2019).  Thus, like it did in *Georgia Power*, federal law governs here.

That brings us to the second part of our inquiry:  following the *Georgia Power* framework, we begin with "the premise that state law should supply the federal rule," unless we find a contrary legislative intent or we conclude that other reasons require us to apply federal law. *Id.* at 1116.  As we have explained, we do that because the Rules of Decision Act expresses "[b]asic considerations of federalism" and sets state law as the default in civil actions. *Id.* at 1115.

a. *Applying the Georgia Power framework, we conclude that congressional intent supports the application of state law to define appropriate compensation in condemnation actions under Section 717f(h).*

Our legislative-intent inquiry further favors application of state law here because it reinforces the outcome-controlling nature of *Georgia Power*. We find "no express congressional intent," *id.* at 1118, that Congress expected federal common law to supply the measure of compensation in a condemnation action under the Natural Gas Act. To the contrary, the original enactment of the Natural Gas Act did not include an eminent-domain provision because it assumed licensees would be able to institute condemnation proceedings for necessary property under *state* statutes or constitutions. *See* S. Rep. No. 429, at 1–2 (1947).

But when Congress learned state law didn't always provide for eminent-domain actions by licensees, it amended the Natural Gas Act in 1947 to add the eminent-domain provision. *See id.* The Senate Report supporting the bill that became that amendment explained that the eminent-domain provision's wording "follows substantially the wording of the eminent domain provision of the Federal Power Act . . . which confers upon concerns that have acquired licenses from the Federal Power Commission [now Federal Energy Regulatory Commission] to operate certain power projects, the right to condemn the necessary property for the location and operation of the projects." *Id.* at 1. The Report continued, "When the Congress passed the Natural Gas Act, it failed to include a similar

provision of eminent domain to those concerns which qualified as natural gas companies under the act and obtained certificates of public convenience and necessity for the acquisition, construction or operation of natural gas pipe lines." *Id.* at 1–2.

We take two lessons from this history. First, Congress intended the eminent-domain right to be coextensive under the Federal Power Act and the Natural Gas Act. That fact strongly suggests that, under both statutes, we must apply the same substantive law on what "compensation" includes. And, because the Federal Power Act uses state substantive law, this suggests that the Natural Gas Act does too.

And second, the fact that Congress initially expected licensees to institute condemnation proceedings under state law independently supports the notion that Congress intended state law to provide the substantive law in condemnation proceedings. To be sure, Congress sought to correct the problem that Natural Gas Act licensees were denied or otherwise unable to exercise the right of eminent domain under state law in some states before the 1947 amendment. *See id.* at 2–3. But ensuring the availability of the right of eminent domain to licensees does not conflict with defining "compensation" under state law. After all, even after the 1947 amendment of the Natural Gas Act, often, private licensees have the option of using state or federal eminent-domain authority to condemn property for use in constructing or maintaining natural-gas pipelines. And the federal standard for compensation in eminent-domain cases establishes the floor, not the ceiling, on

compensation. *See Justice v. City of Peachtree City*, 961 F.2d 188, 194 n.1 (11th Cir. 1992) ("States are free to provide [their] residents and visitors with more protection than the United States Constitution requires.). So applying state law on compensation would not undermine a federal interest in ensuring a minimum amount of compensation.

The upshot of our discussion is that we do not find the legislative intent behind the Natural Gas Act's eminent-domain provision to be "contrary" to application of state law on the substantive meaning of "compensation." Rather—and especially given our reading of the Federal Power Act's materially indistinguishable provision—we think congressional intent supports the application of state law here.

b. *Applying the Georgia Power framework, we do not find good reason to displace state law on the meaning of "compensation" with the federal common-law definition.*

We next assess whether other reasons warrant "displac[ing] state law with federal common law." *Ga. Power*, 617 F.2d at 1118. *Georgia Power* conducts this analysis in three steps: (1) identify the "specific governmental interests" underlying the statute; (2) consider whether applying state law would "virtually . . . nullify the federal objectives"; and (3) if not, weigh "the relative strength of the state's interests in having its rules applied." *See id.*

At the first step, we acknowledge that "important federal interests," *see id.*, exist in issues arising under the Natural Gas Act.

And as in *Georgia Power*, "[t]he overriding federal interest at stake . . . is in implementing or effectuating the federal program." *Id.* at 1120. As for the specific federal interests underlying the Natural Gas Act, the Supreme Court has explained that "the primary aim of the Natural Gas Act is to protect consumers against exploitation at the hands of natural-gas companies." *Sunray Mid-Continent Oil Co. v. Fed. Power Comm'n*, 364 U.S. 137, 147 (1960) (internal citation and quotation marks omitted). To accomplish this goal, the House and Senate Reports accompanying the bill that became the Natural Gas Act reflect that Congress sought "to regulate the transportation and sale of natural gas in interstate commerce . . . ." H.R. Rep. No. 709, at 1; *see also* S. Rep. No. 1162, at 1.

Though these last two interests differ from the other interests underlying the Federal Power Act, that fact does not affect the outcome at the second step of our analysis. At the second step, as in *Georgia Power*, we conclude that applying state law "to the narrow question of the determination of the amount of compensation a licensee must pay a landowner does not result in a conflict which would preclude application of state law." *Ga. Power*, 617 F.2d at 1121.

In reaching this conclusion, we consider both the need for uniformity and the specific interests behind the Natural Gas Act together, since the analysis is interrelated. As to the first, we cannot say that uniformity in calculating compensation bears any more relation to the aims of the Natural Gas Act than it does to those of the Federal Power Act. *See id.* at 1121–22. Similar to the Federal

Power Act's approach to hydroelectric power, the Natural Gas Act does not "represent an attempt by Congress to provide for application of uniform national law to all aspects of [natural-gas sales and transportation] under the Act." *See id.* at 1121 n.14. Rather, the law applies to only interstate transportation and sales of natural gas; it does not apply to intrastate transportation and sales. *See* 15 U.S.C. § 717(b)–(c). Nor does it apply to sale or transportation of vehicular natural gas in certain circumstances. *Id.* § 717f(d).

And even within the interstate-natural-gas field, the Natural Gas Act authorizes "[]reasonable differences in rates, charges, service, facilities, or in any other respect . . . as between localities." *Id.* § 717c(b). In other words, the Act anticipates that a consumer of natural gas in one state—or even in one part of a state—may not pay the same amount for natural gas as a consumer in a different state or part of a state. So to the extent that paying "compensation" based on state law might cause differences in costs to licensees— and therefore differences in rates to consumers—the Natural Gas Act's rate-setting mechanism can account for that.

Plus, as we've mentioned, and as under the Federal Power Act, private licensees often can choose to use state or federal eminent-domain authority to condemn property for use in constructing or maintaining their projects. *See Ga. Power*, 617 F.2d at 1122 (explaining that, under the parallel text in the Federal Power Act, "a licensee often has the option of utilizing either state or federal eminent domain power"); *see also* S. Rep. No. 429, *supra*, at 1–2; *see, e.g.*, Fla. Stat. § 361.05. So if we apply the state standard for

compensation across the board, that actually promotes uniformity to the extent that the state standard would apply, regardless of whether a licensee proceeded under the federal or state eminent-domain right.  But if we adopt the federal standard for compensation as the substantive rule under the Natural Gas Act, then a lack of uniformity would occur because licensees can elect to proceed under the state eminent-domain right and implicate the state standards for compensation, anyway.

On the other hand, under Section 717y's voluntary-conversion program, the Natural Gas Act adopts federal law as the measure of compensation.  So employing state law on the measure of compensation in condemnation actions under the Natural Gas Act would result in the application of two different measures of compensation under the same Act.  But again, given the difference in purpose between the voluntary-conversion and condemnation provisions, we're not convinced that's a meaningful measure of lack of uniformity.

And even if it is, we don't see how the resulting lack of uniformity materially differs from the lack of uniformity under the Federal Power Act that our predecessor Court addressed in *Georgia Power*.  The Federal Power Act provides that the United States may decide to take over hydroelectric projects.  *See* 16 U.S.C. § 807.[8]    If the United States does so, the federal measure of

---

[8] Section 807 authorizes the Commission, after either the expiration of any license or at least two years' notice, "to take over and thereafter to maintain

compensation governs.  *See Ga. Power*, 617 F.2d at 1122.  So we
reasoned in *Georgia Power* that "applying federal law to determine
the measure of compensation in [situations when the United States
takes over a project] but not in [cases when private licensees run
projects], might be thought to be . . . lacking in uniformity and un-
desirable."  *Id.*  Indeed, we noted that it could cause a "loss of uni-
formity even in a single project."  *Id.* at 1122.

Despite this lack of uniformity, we concluded that the pro-
vision authorizing the United States to take over private projects,
at worst, "arguably cancel[ed] out the advantage otherwise gained"
by using state law as the federal substantive standard for "compen-
sation."  *Id.* at 1122–23.  So we found the uniformity question to be
a wash.  *Id.*  We see no meaningful difference between the situa-
tions under the Federal Power Act and the Natural Gas Act as they
involve uniformity.  We therefore conclude that the uniformity
question also comes out even under the Natural Gas Act.

Next, we reach the third step: "weigh[ing] the federal inter-
est in avoiding [any] interference [with the federal interest] against
the state interest in having its law applied."  *Id.* at 1121.  We first
recognize that the same state interests at stake in *Georgia Power*
are at work here—property rights and "providing economical

---

and operate any project or projects" under the Federal Power Act, upon pay-
ment for any taking.  16 U.S.C. § 807(a).  That provision expressly provides
that the United States must pay "just compensation," thereby invoking the
federal standard, if it does so.  *See id.*

energy to [the state's] citizens." *Id.* at 1123. So just like in *Georgia Power*, "accommodating [the states'] interest [in "providing economical energy to their citizens"] with that of insuring that their condemnee-landowner citizens are compensated in accord with their (states') views of what is just, are entitled to weight." *Id.*

We must also resolve the argument that applying the state measure of compensation would cause increased power costs to consumers the same way we did in *Georgia Power*. There, as here, we find no "indication of specific legislative intent to impose . . . a burden on . . . landowners" to "partially . . . subsidize a private . . . utility and consumers of [natural gas] in a way which would not be required of them if [state] law were applied." *Id.* at 1124. So here, similar to our conclusion in *Georgia Power*, we decline to "presume that Congress would have balanced the interests of private licensees and consumers of [natural gas], on the one hand, and the property owners, on the other hand," differently from how Florida's laws "balance such interests." *Id.*

At bottom, based on the *Georgia Power* analysis that binds us, we must conclude that "the showing of federal interests and effects thereon of applying state law [are not] sufficient to overcome" [the] preference" for applying state law. *Id.* We note that the only two other Circuits to have considered this question have reached the same answer. *See Tenn. Gas Pipeline Co.*, 931 F.3d at 241; *Columbia Gas Transmission Corp. v. Exclusive Nat. Gas Storage Easement 6*, 962 F.2d 1192, 1199 (6th Cir. 1992).

### E. *Sabal Trail's arguments against applying Georgia Power fail.*

Sabal Trail raises two arguments that we have not already addressed in our *Georgia Power* discussion as to why *Georgia Power* should not control our analysis. First, Sabal Trail contends that, because it exercised power delegated to it by the federal government, the Supremacy Clause[9] dictates that the federal measure of compensation must apply, and *Georgia Power*'s framework is irrelevant. And second, Sabal Trail asserts that Federal Rule of Civil Procedure 71.1 precludes the award of attorney's fees here. We are not persuaded.

*First*, we address Sabal Trail's Supremacy Clause argument. Sabal Trail relies on *Kohl v. United States*, 91 U.S. 367 (1875), *United States v. Miller*, 317 U.S. 369 (1943), and *PennEast,* 141 S. Ct. 2244, to argue that the federal measure of compensation must govern because, when licensees exercise the federal eminent-domain power, that power and everything that goes with it—including the measure of compensation—are coextensive with whatever they would be if the federal government itself exercised its eminent-domain power. We do not agree that *Kohl*, *Miller*, and

---

[9] The Supremacy Clause provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

*PennEast* require application of the federal measure of compensation to condemnation proceedings under the Natural Gas Act.

For starters, our predecessor Court issued *Georgia Power* after *Kohl* and *Miller* came out. So even if this Court "overlooked" *Kohl* and *Miller*, our prior-precedent rule would still render *Georgia Power* binding. *See Smith*, 236 F.3d at 1303–04.

And in any case, *Georgia Power* did not overlook *Miller* because it distinguished the decision and found it inapplicable to the question of the measure of compensation under the Federal Power Act. More specifically, *Georgia Power* did not find *Miller* instructive because *Miller* involved a situation "where the United States [was] the party condemning and paying for the land," but *Georgia Power* did not. *Ga. Power*, 617 F.2d at 1119. Although licensees rely on the federal power of eminent domain under the Federal Power Act, we explained that "the nature of the federal interests involved differ markedly [when a private licensee institutes condemnation proceedings than] from the nature of the federal interests involved where the United States is the condemnor." *Id.* at 1119–20. Under our prior-precedent rule, then, *Kohl* and *Miller* cannot render *Georgia Power* inapplicable.

As for *PennEast*, of course, an intervening Supreme Court decision can abrogate our precedent. *Kaley*, 579 F.3d at 1255. But to do so, that Supreme Court decision "must be clearly on point" and must "actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel." *Id.* (citation and

quotation marks omitted). *PennEast* does not satisfy that threshold.

In *PennEast*, the Supreme Court held that the Natural Gas Act authorizes private licensees to condemn all necessary property, regardless of whether another private party or a state owns the property. 141 S. Ct. at 2252. In reaching this conclusion, the Court reaffirmed the point from *Kohl* that "[t]he federal eminent domain power . . . can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised." *Id.* (quoting *Kohl*, 91 U.S. at 374) (internal quotation marks omitted).

But *PennEast*'s quotations from *Kohl* are not "clearly on point," and *PennEast* does not "actually abrogate or directly conflict with," *Kaley*, 579 F.3d at 1255, our holding in *Georgia Power*. *PennEast* was concerned with a state's attempt to deny exercise of the federal power of eminent domain when Congress chose to delegate that power to a private party. In *Georgia Power* and here, by contrast, no state is denying Sabal Trail's ability to exercise its federal eminent-domain power. Rather, we must "declare the governing law in an area comprising issues substantially related to an established program of government operation" because "the statute does not specify the appropriate rule of decision." *Ga. Power*, 617 F.2d at 1115. More to the point, we must simply ascertain whether state law or the federal common law should supply the measure of compensation for condemnations under Section 717f(h).

Plus, 95 years before *Georgia Power* issued, the Supreme Court wrote the exact same words in *Kohl* that it quoted in *PennEast*. So we cannot say that the Supreme Court's reinvocation of them is something new. And under our prior-precedent rule, even if our Court "overlooked" a reason—including a Supreme Court case—we remain bound by our prior precedent. *See Kaley*, 579 F.3d at 1255.

*Second*, Sabal Trail contends that Rule 71.1, FED. R. CIV. P., precludes awards of attorney's fees under the Natural Gas Act. In our view, this argument misunderstands the issue. For starters, we do not decide today that attorney's fees and costs are generally recoverable under the Natural Gas Act. Rather, we decide only that we apply state law to determine the measure of compensation in condemnation proceedings arising out of § 717f(h). It so happens that when we do that here, Florida's measure of compensation includes attorney's fees and costs. But that does not change the nature of our decision today to one about whether the Natural Gas Act authorizes awards of attorney's fees. And since the Natural Gas Act does not preclude awards of attorney's fees, that Florida's measure of compensation includes them does not present a problem.[10]

---

[10] Sabal Trail also argues that *Georgia Power* does not apply because attorney's fees are not part of "compensation" in a condemnation action. This argument assumes its answer and does not account for Florida's definition of "compensation" in a condemnation action. Indeed, in *Georgia Power*, we recognized that some states "award[] costs and expenses, including attorneys'

As for Rule 71.1, it does not bear on the question of the measure of compensation to apply under the Natural Gas Act. Rather, it governs only "practice and procedure," not substantive law. *See S. Nat. Gas Co. v. Land, Cullman Cnty.*, 197 F.3d 1368, 1373–74 (11th Cir. 1999).[11] As we explained in *Southern Natural Gas*, the Advisory Committee Notes provide that "Rule 71A affords a uniform *procedure* for all cases of condemnation invoking the national power of eminent domain, and . . . supplants all statutes prescribing a different *procedure*." *Id.* at 1374 (citation omitted) (emphasis added). Not only that, but what is currently called Rule 71.1 existed when our predecessor Court issued *Georgia Power*. And the rule also applied to condemnation proceedings under the Federal Power Act at that time. In fact, our Court even cited the rule in its opinion. *See Ga. Power*, 617 F.2d at 1114–15 (noting that, under Rule 71A, the district judge there appointed a three-member commission to determine the amount of compensation due). So not only does the rule lack relevance to substantive questions of law, but also, under our prior-precedent rule, it cannot free us from *Georgia Power*'s binding nature.

In short, *Georgia Power* governs this case from beginning to end. And under it, we are bound to hold that state law supplies the

---

fees" as part of compensation in condemnation actions. *See Ga. Power*, 617 F.2d at 1119 n.10.

[11] Rule 71A, FED. R. CIV. P., was renamed Rule 71.1, FED. R. CIV. P. in 2007. *See* FED. R. CIV. P. 71.1 Advisory Committee Notes for 2007 amendment.

measure of compensation in proceedings that arise under Section 717f(h) of the Natural Gas Act.

## IV.

For the foregoing reasons, we hold that state law provides the measure of compensation in proceedings that arise under Section 717f(h) of the Natural Gas Act. The parties agree that under Florida law, the Thomas family is entitled to an award of attorney's fees and costs as part of its compensation. Sabal Trail offers no other reason that the district court's award here should not be upheld. So we affirm the judgment of the district court.

**AFFIRMED.**

21-11995               JORDAN, J., Concurring               1

JORDAN, Circuit Judge, Concurring:

I agree that *Georgia Power Co. v. Sanders*, 617 F.2d 1112, 1119-20 (5th Cir. 1980) (en banc), controls the outcome of this case, and therefore join Judge Rosenbaum's opinion for the court. But, like the *Georgia Power* dissenters, I "fail to perceive any sound reason to distinguish between condemnation proceedings brought by the United States and those in which it authorizes its power to be used by its statutory licensee for a federal public purpose." *See id.* at 1129 (Rubin, J., dissenting). If I were writing on a blank slate, I would apply the federal standard for just compensation. *See also Tennessee Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres,* 931 F.3d 237, 257 (3d Cir. 2019) (Chagares, J., dissenting) ("[B]ecause Congress has authorized natural gas companies to invoke the federal eminent domain power under the [Natural Gas Act], and because exercise of that power entitles a landowner to just compensation under the Fifth Amendment, the question of just compensation in a [Natural Gas Act] condemnation action is a question of federal substantive right to which federal substantive law applies.").

Just compensation under federal law does not include attorney's fees. *See United States v. Bodcaw Co.*, 440 U.S. 202, 203 (1979) ("Thus, attorneys' fees and expenses are not embraced within just compensation."). It seems to me, then, that a private delegee invoking the federal government's eminent domain power should not have to pay a property owner's attorney's fees. Nothing in the Constitution or the Natural Gas Act dictates otherwise. And

"[t]o carve out a separate set of rules for private parties exercising federal eminent domain power for a federal public purpose . . . would create 'an artificial wedge between federal condemnations brought by the United States and federal condemnations brought by private entities acting pursuant to congressionally delegated authority.'" *Tennessee Gas Pipeline Co.*, 931 F.3d at 257 (Chagares, J., dissenting). *See also Georgia Power Co. v. 54.20 Acres of Land*, 563 F.2d 1178, 1188-89 (5th Cir. 1977) (Wisdom, J.) ("[W]e find no reason to ignore the general rule of following federal law to set compensation because the United States is not taking the land directly. . . . The balance tips toward the need for federal law."), *overruled by Georgia Power*, 617 F.2d at 1124. *Cf. Nat'l R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1265-67 (2d Cir. 1987) (holding, in a case involving Amtrak's condemnation of land pursuant to 45 U.S.C. § 545(d)(1)(B) (1982), that the federal standard for just compensation applied, and distinguishing *Georgia Power* because "the federal interests supporting Amtrak's mission are identifiable and strong and the application of state law would 'actually frustrate' federal objectives").